No. 23-10184

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

**JOHNNIE DAVIS,**
**Petitioner/Appellant,**

**v.**

**UNITED STATES OF AMERICA.,**
**Respondent/Appellee.**

_____

**ON APPEAL FROM THE**
**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**2:21-cr-101-MHT-JTA-1**

_____

**BRIEF OF THE APPELLANT**
**JOHNNIE DAVIS**

**J.D. Lloyd**
**The Law Office of J.D. Lloyd, LLC**
**2320 Arlington Ave. S.**
**Birmingham, AL 35205**
**O. 205-538-3340**
**JDLloyd@JDLloydLaw.com**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff-Appellee,** | ) | **Appeal No. 23-10184** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JOHNNIE DAVIS,** | ) | |
| **Defendant, Appellant.** | ) | |

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The appellant, Johnnie Davis, through undersigned counsel, pursuant to Fed. R. App. P. 26.1, 11th Cir. R. 26.1-1, and 11th Cir. R. 26.1-2(a) certifies that the following persons may have an interest in the outcome of this case:

1.  Adams, The Honorable Jerusha T., United States Magistrate Judge for the Middle District of Alabama;

2.  Counts, Eric M., Assistant United States Attorney, Middle District of Alabama, counsel for the United States in the district court;

3.  Davis, Johnnie, Defendant/Appellant;

4.  Davidson, Kevin P., Assistant United States Attorney, Middle District of Alabama;

i

5. Duffey, Jeffrey Clyde, counsel for Defendant/Appellant Davis;

6. Geer, III, John Joseph, Assistant United States Attorney, Middle District of Alabama, counsel for the United States in the district court;

7. Griffin, Jr., Gregory Oswold, Assistant United States Attorney, Middle District of Alabama, counsel for the United States in the district court;

8. Jones, Justin Louis, Assistant United States Attorney, Middle District of Alabama, counsel for the United States in the district court;

9. Keith, Richard K., Montgomery, Alabama, former CJA appointed counsel for Defendant/Appellant Davis in the district court;

10. Lloyd, John Douglas (J.D.), appellate counsel for Defendant/Appellant Davis;

11. Stewart, Sandra J., United States Attorney for the Middle District of Alabama;

12. Talley, Brett J., Assistant United States Attorney, Middle District of Alabama, counsel for the United States in the district court;

13. The United States of America, Plaintiff/Appellee; and

14.    Thompson, The Honorable Myron H., United States District

Judge, Middle District of Alabama.

/s J.D. Lloyd
J.D. Lloyd

*Counsel for Petitioner*

## STATEMENT REGARDING ORAL ARGUMENT

Davis respectfully requests oral arguments in this matter as his case presents several issues of first impression.

# TABLE OF CONTENTS

Certificate of Interested Persons ..................................................................i

Statement Regarding Oral Argument ........................................................iv

Table of Citations ........................................................................................vi

Statement of Jurisdiction..........................................................................viii

Statement of the Issues................................................................................1

Statement of the Case ..................................................................................2

   1. Course of Proceedings Below ............................................................2

   2. Statement of the Facts ........................................................................6

      a. Suppression Hearing – Davis' statement to police.................6

      b. Suppression Hearings – the Google warrant..........................9

      c. Trial ........................................................................................20

         i. January 23, 2020 ........................................................20

         ii. October 30, 2020 ........................................................23

         iii. November 11, 2020 ....................................................26

         iv. Davis' arrest and statement to investigators .............28

   3. Standard of Review ..........................................................................29

Summary of the Argument ........................................................................30

Argument ...................................................................................................32

I.   The district court erred in denying Davis' two motions to suppress evidence despite multiple violations of his Fourth Amendment rights....................................................................................32

     A. The district court should have suppressed the fruits of the Google warrant...........................................................................32

          1. Davis had standing to challenge this warrant..............33

          2. Faggert's alteration of the warrant without judicial authorization warrants suppression of the evidence seized pursuant to the Google warrant.......................40

          3. Good faith under Leon should not apply to a warrant process that suffered from so many Fourth Amendment failings...................................................................49

               a.   The warrant abdicated judicial responsibility in favor of law enforcement discretion....................50

               b.   The warrant completely lacked an indicium of probable cause justifying a search through the entirety of Google account-holder information......53

               c.   Investigators should have known that the warrant in hand was unconstitutional............................55

     B. Davis' confession to law enforcement was due to be suppressed because officers violated his right to a timely presentment under federal law.....................................................................61

II.  Davis is due judgments of acquittal to his remaining charges because the United States failed to present sufficient evidence demonstrating Davis intended to seriously harm or kill any of his carjacking victims.................................................................74

vi

Conclusion .................................................................................... 81

Certificate of Compliance ........................................................... 82

Certificate of Service .................................................................. 82

# TABLE OF CITATIONS

## Cases

*Alderman v. United States*, 394 U.S. 165 (1969)....................................33

*Anderson v. United States*, 318 U.S. 350 (1943) ..............................67, 68

*Barnett v. United States*, 384 F.2d 848 (5th Cir. 1967) ...................68, 69

*Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388 (1971) .....41

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981)..................68

*Brown v. Byer,* 870 F.2d 975 (5th Cir. 1989) ..........................................43

*Byrd v. United States*, 138 S. Ct. 1518 (2018)............................33, 34, 35

*California v. Ciraolo*, 476 U.S. 207 (1986) .............................................34

*Carpenter v. United States*, 138 S. Ct. 2206 (2018)...............35, 36, 39, 40

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971)...................................43

*Corley v. United States*, 556 U.S. 303 (2009)....................................65, 66

*Cosby v. Jones*, 682 F.2d 1373 (11th Cir. 1982) .....................................77

*Groh v. Ramirez*, 540 U.S. 551 (2004) ............................................ passim

*Hernandez v. People*, 153 Colo. 316, 385 O.2d 996 (1963) .....................44

*Holloway v. United States*, 526 U.S. 1 (1999)....................................75, 76

*In re Smith*, 829 F.3d 1276 (11th Cir. 2016) ..........................................77

*Jackson v. Virginia*, 443 U.S. 307 (1979) ...............................................77

*Johnson v. United States*, 333 U.S. 10 (1946) ........................................ 43

*Katz v. United States*, 389 U.S. 347 (1967) ................................ 34, 40, 42

*Lo-Ji Salves v. New York*, 442 U.S. 319 (1979) ....................................... 52

*Mallory v. United States*, 354 U.S. 449 (1957) ...................................... 66

*Massachusetts v. Sheppard*, 468 U.S. 981 (1984)................. 42, 56, 57, 58

*McNabb v. United States* 318 U.S. 332 (1943) .................................. 65, 66

*Minnesota v. Olson*, 495 U.S. 91 (1990) ................................................ 34

*Miranda v. Arizona*, 384 U.S. 436 (1966) ............................................. 66

*Rakas v. Illinois,* 439 U.S. 128 (1978) ................................................... 35

*United States v. Jones*, 565 U.S. 400 (2012) .......................................... 37

*Smith v. Maryland*, 442 U.S. 735 (1979) .......................................... 34, 36

*State v. Yoder*, 96 Idaho 651, 653 P.2d 771 (1975)................................. 44

*States v. Taxacher*, 902 F. 2d 867 (11th Cir. 1990) ............................... 55

*United States v. Accardo*, 749 F. 2d 1477 (11th Cir. 1985).................... 55

*United States v. Alvarez-Sanchez*, 511 U.S. 350 (1994)......................... 67

*United States v. Arenal*, 768 F.2d 263 (8th Cir. 1985)........................... 43

*United States v. Blake*, 868 F.3d 960 (11th Cir. 2017)..................... 59, 60

*United States v. Bowler*, 561 F.2d 1323 (9th Cir. 1977) ........................ 44

*United States v. Burke*, 784 F.2d 1090 (11th Cir. 1986) ................... 44, 45

*United States v. Charles*, 313 F. 3d 1278 (11th Cir. 2002) ..................... 77

*United States v. Coffee*, 434 F.3d 887 (6th Cir. 2006) ............................. 54

*United States v. Diaz*, 248 F.3d 1065 (11th Cir. 2001) .................... 74, 75

*United States v. Fulford*, 267 F.3d 1241 (11th Cir. 2001) ..................... 75

*United States v. Glinton*, 154 F.3d 1245 (11th Cir. 1998) ..................... 54

*United States v. Guilbert,* 692 F.2d 1340 (11th Cir. 1982) .................... 75

*United States v. Katoa*, 379 F.3d 1203 (10th Cir. 2004) ........................ 43

*United States v. Leon,* 468 U.S. 897 (1984). ................................ 20, 49, 56

*United States v. Lockett*, 674 F.2d 843 (11th Cir. 1982) ........................ 54

*United States v. Martin*, 297 F. 3d 1308 (11th Cir. 2002) .......... 29, 49, 54

*United States v. Maxi*, 886 F. 3d 1318 (11th Cir. 2018).......................... 34

*United States v. Miller*, 425 U.S. 435 (1976) .......................................... 36

*United States v. Pratt*, 438 F.3d 1264 (11th Cir. 2006). ................... 42, 48

*United States v. Rhine*, 2023 WL 372044 (D.D.C. Jan. 24, 2023) ............ 9

*United States v. Smith*, 459 F.3d 1276 (11th Cir. 2006)......................... 29

*United States v. Taylor*, 480 F.3d 1025 (11th Cir. 2007). ....................... 29

*United States v. Tedford*, 875 F.2d 446 (5th Cir. 1989) .......................... 72

*United States v. Travers*, 233 F.3d 1327 (11th Cir. 2000) ...................... 51

*Upshaw v. United States*, 335 U.S. 410 (1948)........................................ 66

## Statutes

18 U.S.C. § 924(c)(1) ................................................................... 2

18 U.S.C. § 1951 ..................................................................... 2, 62

18 U.S.C. § 2119 ......................................................................... 62

18 U.S.C. § 3501 ................................................................... 61, 64

18 U.S.C. § 3501(c) .............................................................. 66, 67

## Rules

Rule 41(b), Fed. R. Crim. P. ....................................................... 43

Rule 5(a), Fed. R. Crim. P. ........................................... 6, 30, 61, 64

## STATEMENT OF JURISDICTION

This is a direct appeal from Johnnie Davis' criminal convictions and resulting sentences. Doc. 205. The United States District Court for the Middle District of Alabama had original subject matter jurisdiction pursuant to 18 U.S.C. § 3231 and entered its judgment on January 18, 2023. *Id.* A timely notice of appeal was filed on January 13, 2023. Doc. 202. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

I.    Did the district court err in denying Davis' motions to suppress on the grounds that (1) he lacked standing to challenge the geofence warrant issued in his case, (2) officers did not impermissibly alter that warrant, (3) officers acted in good faith in obtaining and exercising the geofence warrant, and (4) his right to presentment was not violated when federal and state officers arrested him on state charges in this case?

II.   Is Davis due judgment of acquittal for his carjacking charges (as well as his brandishing charges) where the United States failed to present sufficient evidence that he intended to seriously harm or kill any victim?

1

## STATEMENT OF THE CASE

**1. Course of the Proceedings**

The grand jury of the Middle District of Alabama returned a 10-count indictment against the appellant, Johnnie Davis. Doc. 4. Later, the grand jury returned a 14-count superseding indictment stemming from carjackings, Hobbs Act robberies, and firearm brandishing offenses that occurred on three separate dates: October 30, 2020 (Counts 1-4), November 11, 2020 (Counts 5-10), and January 23, 2020 (Counts 11-14). Doc. 62

On October 30, 2020, Davis allegedly carjacked Charles Rollins and his son (a violation of § 18 U.S.C. § 2119) (Count 1) and robbed a Dollar General Store (a violation of 18 U.S.C. § 1951) (Count 3) while brandishing a firearm during both offenses (violations of 18 U.S.C. § 924(c)(1)) (Counts 2 and 4, respectively). *Id.* On November 11, 2020, Davis allegedly carjacked Alan Rivas (Count 5) and robbed a Fresh Market store (Count 7) and another Dollar General store (Count 9) while brandishing a firearm during all three offenses. (Counts 6, 8, and 10, respectively). On January 23, 2020, Davis allegedly carjacked Miangle Thomas (Count 11) and a Sunoco gas station (Count 13) while brandishing a firearm during both offenses (Counts 12 and 14, respectively).

2

Davis filed several motions to suppress. In the first motion, Davis moved to suppress inculpatory statements made to law enforcement after his arrest on the grounds that his presentment rights were violated. Doc. 85, 89, 92. A magistrate judge held a hearing on this motion on February 10, 2021. *See* Doc. 113. Both parties submitted further briefing. Doc. 100, 101, 102. The magistrate recommended that this motion be denied. Doc. 117. Davis objected. Doc. 130, 132. *See also* Doc. 136 (United States' response). The district court partially adopted the recommendation. Doc. 142.

In a second motion to suppress, Davis moved to suppress evidence uncovered pursuant to a search warrant issued to Google on March 9, 2020. Doc. 110[1]; *see also* Doc. 114 (United States response) and Doc. 116 (Davis' reply to United States' response). The magistrate held a hearing on this motion on May 3, 2022, and carried the hearing over to May 25th after an issue arose regarding discrepancies in the version of search warrant filed

---

[1] Law enforcement obtained warrants directed to Google in December 2018 ("Google 1" warrant) and in March 2020 ("Google 2" warrant). Since only the Google 2 warrant yielded evidence connected to the investigation, Davis later dropped his challenge to the Google 1 warrant. Doc. 135 at 3. As such, all subsequent references to "the Google warrant" refers to the "Google 2" warrant obtained in March 2020.

3

with the clerk's office and the one purportedly served on Google. Doc. 120, 135. After the second hearing, Davis and the United States filed supplements to their positions. Doc. 132, 136. On July 1, 2022, the magistrate recommended that this motion to suppress be denied. Doc. 138. Davis objected, *see* Doc. 110, but the district court overruled the objection and adopted the magistrate judge's recommendation and denied the motion. Doc. 148.

Davis' case proceeded to trial. At the conclusion of the United States' case, Davis moved for a judgment of acquittal. Doc. 226 at 17. Davis argued that with respect to the carjacking charges (Counts 1, 5, and 11) the United States failed to present sufficient evidence that Davis had the intent to cause death or serious bodily harm when he purportedly carjacked the victims. *Id.* at 18. The court denied this request. *Id.* at 27. Davis also argued that because the United States failed to prove prima facie cases of carjacking, that he was likewise due judgments of acquittal on the connected brandishing charges (Counts 2, 6, and 12). *Id.* at 28-29. Finally, Davis argued that the United States failed to present evidence of an interstate nexus for the robbery charges (Counts 3, 7, 9 and 13) and, as such, was due judgments of acquittal on those charges and the

4

corresponding brandishing charges (Counts 4, 8, 10, and 14). *Id.* at 31. The district court ultimately granted the motion for the robbery charges and the corresponding brandishing charges. *Id.* at 38-40. (oral motion granted dismissing Counts 3-4, 7-10, and 13-14; Doc. 160).

Ultimately, the jury convicted Davis on Counts 1-2, 5-6, and 11-12. Doc. 163.

On June 26, 2022, Davis filed a timely motion for judgment of acquittal under Rule 29, Fed. R. Crim. P. Doc. 173. Davis reiterated that the United States failed to prove that he had any intent to cause death or severe bodily harm as required for the carjacking convictions. *Id.* Davis also argued that he was due judgments of acquittal for his § 924(c) charges because there can be no § 924(c) conviction without an accompanying violent crime conviction. *Id.* The district court denied this motion. Doc. 190.

The district court sentenced Davis to 63 months on Counts 1, 5, and 11 and 84 months on Counts 2, 6, and 12. Doc. 205. The sentences for Counts 1, 5, and 11 were set to run concurrently, but the sentences for Counts 2, 6, and 12 were set to run consecutively to each other and all other counts. *Id.*

5

This timely appeal followed. Doc. 202.

## 2. Statement of the Facts

### a. Suppression Hearing – Davis' statement to police

Davis' first motion to suppress asked the court to suppress the statement he made to investigators on November 12, 2020. Doc. 85. Specifically, Davis argued that the statement should be suppressed because the United States failed to comply with presentment requirements of Rule 5(a), Fed. R. Crim. P. *Id*. at 1-2. Additionally, Davis argued that while he was arrested on state warrants, federal authorities spearheaded the investigation, and the rules of presentment should apply to his situation. *Id*. at 2-3.

Nathan Miles Faggert—formerly a Montgomery Police Department ("MPD") officer who served with a federal task force—testified to his involvement in the investigation, arrest, and interrogation of Davis. Doc. 113 at 13-14. Faggert admitted that Davis' confession took place about 8 hours after he was initially detained. *Id*. at 47.

Davis questioned Faggert extensively about the federal resources and legal mechanisms used in the investigation. *Id*. at 15-43. Faggert explained that the MPD relied upon federal resources because the costs to

6

issue warrants to obtain cell phone tower data were too large for the city's budget. *Id.* at 52. Faggert ultimately decided to seek state arrest and search warrants for November 12th —rather than federal warrants—because he believed it would be easier to get state warrants. *Id.* at 42, 56. Faggert admitted that investigators had enough information to get federal warrants for Davis' arrest based on corroborating evidence between the January 23rd and October 30th carjacking-robberies. *Id.* at 58. Faggert denied that investigators were pursuing federal charges at this time and wouldn't "until we had more facts that we could present to the U.S. Attorney's Office supporting our – our conclusion that Davis is our suspect." *Id.* at 60. Faggert, however, had testified that federal investigators got involved in this case in 2017 because "these are crimes that involve federal violations as well." *Id.* at 52.

On cross-examination by the United States, Faggert explained that from July 2014 to June 2017, the Montgomery County area had experienced 9 carjackings and 26 business robberies. *Id.* at 62. The FBI began investigating these offenses in 2017. *Id.* at 63. Faggert testified that from July 2014 until the day Davis was arrested, approximately 40 carjackings and business robberies had taken place in the area. *Id.* at 65. Faggert

7

explained that he frequently met with federal investigators over the years. *Id.* at 68-69. Faggert had a meeting scheduled for November 12, 2020, to obtain a new warrant involving "infotainment systems" from vehicles used in connection with the October 30th offenses. *Id.* at 67-69.

The district court adopted the magistrate's recommendations that suppression was not warranted on Davis' presentment claim because (1) the right to prompt presentment under Rule 5(a)(1)(A) didn't apply to Davis since he was in custody on state charges, and (2) there was "insufficient evidence of improper collusion between state and federal law enforcement for the federal prompt-presentment rule to apply." Doc. 142.

**b. Suppression Hearings – the Google warrant**

Davis also moved to suppress all evidence obtained through a geofence warrant[2] issued to Google on March 9, 2020. Doc. 110 at 6. Davis asserted that this warrant issued was unconstitutional under the Fourth Amendment as both overbroad and lacking in particularity. *Id.* at 8. As subsequent testimony explained, "the warrant asks Google to search its database for users that are identified in that area with the established parameters for information." Doc. 120 at 12. The United States opposed Davis' particularity argument and asserted: (1) Davis had no standing to

---

[2] Testimony at the resulting suppression hearing established that by obtaining a geofence warrant directed to a company like Google, law enforcement may obtain location history of user accounts via applications or programs active on someone's cell phone or other device within a geographic area. Doc. 110 at 8; Doc. 120 at 12. *See also United States v. Rhine*, 2023 WL 372044, at *17 (D.D.C. Jan. 24, 2023) ("Unlike a warrant authorizing surveillance of a known suspect, geofencing is a technique law enforcement has increasingly utilized when the crime location is known but the identities of suspects is not. At a basic level, a geofence warrant seeks cell phone location data stored by third-party companies like Google, which offers the Android operating system on which millions of smart phones run and offers other applications commonly used on phones running on other operating systems. The scope of location data captured by a geofence is limited by geographic and temporal parameters, so geofence warrants identify the physical area and the time range in which there is probable cause to believe that criminal activity occurred.") (footnotes and internal citations omitted).

9

challenge the Google warrant that resulted in disclosure of account infor-
mation of another that led to his arrest and (2) officers acted in good faith.
Doc. 114. Davis filed a reply. Doc. 116. As this litigation unfolded, another
ground for suppression arose regarding discrepancies in the search war-
rants filed with the clerk's office and the search warrants purportedly
served on Google.

The court held an initial suppression hearing on May 3, 2022, in which
Faggert again testified. Doc. 120 at 1, 6. Faggert served as the lead in-
vestigator for procuring the Google warrant. *Id.* at 7-8. He explained that
law enforcement had no suspect in the investigation, and they turned to
seeking a geofence warrant to try to identify Google users in the areas
specified by law enforcement, which would hopefully lead to the perpe-
trator. *Id.* at 12. This information provided by Google would hopefully
allow law enforcement to identify devices (and then suspects) that were
consistently in the areas of the offenses. *Id.* at 58. Faggert had never ob-
tained a geofence warrant before Davis' case. *Id.* at 12-13.

During the hearing, Davis admitted the March 9, 2020, Google war-
rant (Defense Exhibit 4; Doc. 131-9) and the accompanying search war-
rant application (Defense Exhibit 3; Doc. 131-8). *Id.* at 9, 10-11. Referring

10

to Attachment A to the search warrant application, Faggert testified that from video surveillance in the area of a series of carjackings and robberies, law enforcement identified six locations and certain time periods of interest to include in the Google warrant. *Id.* at 17-20. Faggert admitted that he had no idea if the suspect(s) used a cell phone or other device during the offenses. *Id.* at 17. In fact, the affidavit in support of the warrant offered only the following regarding the possible presence of a trackable device: "If the perpetrator(s) of the above detailed crimes was in possession of a cell phone which had an Android operating system, it is likely that Google is in possession of information that could lead to the identification of the perpetrator(s)." *Id.* at 18.

Attachment A to the search warrant application detailed the geolocation coordinates and timing parameters and referenced other attachments, Attachments B-D, which Faggert explained provided a visual representation of the area of interest for Google to search. *Id.* at 21-24. Faggert explained that the search location parameters would include anyone with a Google account who happened to be in those areas whether they were driving through, in an office building, or in a motel, apartment, or other dwelling, including homes. *Id.* at 22-24.

11

Faggert also testified to an Attachment E included with the search warrant application, which provided "the items to be seized and searched by Google." *Id.* at 24. Attachment E outlined a four-step process for Google to 1) query location history data based on the provided parameters, 2) provide anonymous unique identifying numbers and other information for each device within the provided search parameters, 3) respond to law enforcement requests for additional information based on the initial information returned, and 4) provide subscriber information at law enforcement request. *Id.* at 24-28.

Faggert explained that pursuant to Attachment E, law enforcement could request and receive additional information from Google even outside of the parameters originally listed without having to first present that renewed/updated request to a judge. *Id.* at 28. Essentially under these steps, law enforcement would use the initial data returned, narrow it, pursue suspect leads, and then request specific subscriber information from Google. *Id.* at 28-29.

Faggert also testified to the return of information from Google (Defense Exhibit 5, Doc. 131-10). *Id.* at 36-37. This included the initial data returned of all Google subscribers within the parameters provided, more

specific information at law enforcement request, and requested sub-scriber information. *Id.* at 38-39. Although Faggert requested Google search six locations, Google returned with search information for nine locations. *Id.* at 43. Faggert believed that Google needed to separate the location areas into smaller sections to complete the requested searches, but no response from Google detailed its approach and no judge approved this process. *Id.* at 43-45. Finally, law enforcement received subscriber information for three individuals, including a Gmail account for a username containing the name "Yanna." *Id.* at 40, 58. This subscriber information led law enforcement to Davis as law enforcement believed this account belonged to the daughter of Portia Gilbert, Davis' girlfriend. *Id.* at 40-41, 59.

During this hearing, an issue arose regarding the Google warrant as it was filed into PACER by the clerk's office. Faggert initially testified that he served the warrant and attachments on Google via an electronic portal set up by Google to handle subpoenas, search warrants, and other legal matters. *Id.* 30-31. Counsel for Davis questioned Faggert about Defense's Exhibit 4, which was a copy of the Google warrant that had been retrieved from PACER. *Id.* at 31. Faggert could not explain why the

13

warrant itself had no attachments although the warrant referenced Attachments A and B. *Id.* at 31. Faggert admitted he could not be sure of exactly what documents he served on Google through the portal. *Id.* at 32. However, later on cross-examination, Faggert explained that Google would have had to receive the information contained in Attachment E to complete the multi-step search process outlined within it. *Id.* at 61.

Toward the conclusion of the hearing, the court inquired about documentation related to the warrant return (Defense Exhibit 5) as well as whether certain attachments were transmitted to Google with the warrant (Defense Exhibit 4). *Id.* at 66. Counsel for Davis explained that the warrant and warrant application exhibits were entered into evidence at this hearing exactly as provided by the clerk's office. *Id.* at 67. The court remarked: "it appears that we also need to know how Google obtained the other attachments which are not mentioned in that search warrant, attachments C, D, and E. I believe E provides the steps." *Id.* at 67. The United States agreed to investigate the matter further and the court suspended the suppression hearing. *Id.* at 67-68.

The Google warrant suppression hearing resumed on May 25, 2022, with further testimony from Faggert. Doc. 135 at 1, 5. Prior to this

14

hearing, the United States had disclosed additional relevant documentation that Davis admitted as Defense Exhibits 9-12 (Doc. 131-14, Doc. 131-15, Doc. 131-16, and Doc. 131-17). *Id.* at 4. These exhibits included Defense Exhibit 9, which was a copy of the Google search warrant that has been altered and initialed by Faggert changing Attachment "B" to Attachment "E." *Id.* at 5. A visual comparison of Defense Exhibit 4 (the version of the warrant retrieved from PACER) and Defense Exhibit 9 (the version of the warrant provided by the United States prior to the May 25th portion of the hearing) is helpful here:

15

Case 2:21-cr-00101-MHT-JTA  Document 110-4  Filed 04/20/22  Page 2 of 3
Case 2:20-mj-00064-SRW *SEALED*  Document 4  Filed 03/09/20  Page 1 of 2

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Alabama

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information that is stored at premises controlled by<br>Google, 1600 Amphitheatre Parkway, Mountain View,<br>CA 94043. | )<br>)<br>) Case No. 2:20mj64-SRW<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Northern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

YOU ARE COMMANDED to execute this warrant on or before _____March 16, 2020_____
                                                                          *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10 p.m.   ☑ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
_____Susan R. Walker_____
*(name)*

☑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☑ for ____30____ days *(not to exceed 30)*
                                     ☐ until, the facts justifying, the later specific date of _____

Date and time issued: ___3/9/20___  ___11:23 a___        _____
                                                          *Judge's signature*

City and state:   Montgomery, AL  _____        Susan R. Walker, U.S. Magistrate Judge
                                                          *Printed name and title*

(Defense Exhibit 4)

16

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Alabama

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Information that is stored at premises controlled by<br>Google, 1600 Amphitheatre Parkway, Mountain View,<br>CA 94043. | )<br>)<br>)    Case No.  2:20mj64-SRW<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Northern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B.E *nm4*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before         March 16, 2020
                                                                                                    *(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.     ☑ at any time in the day or night as I find reasonable cause has been
                                                                              established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
                    Susan R. Walker                            .
                         *(name)*

☑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☑ for ___30___ days *(not to exceed 30)*.
                                                        ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   3/9/20   11:23 a       [signature]
                                                                                    *Judge's signature*

City and state:   Montgomery, AL                    Susan R. Walker, U.S. Magistrate Judge
                                                                              *Printed name and title*

(Defense Exhibit 9.)

Unlike Defense Exhibit 4, Defense Exhibit 9 included Attachments A-E. Doc 135 at 6. Those attachments, again, were not appended to the Google warrant filed with the clerk's office and entered into PACER

17

Defense Exhibit 4) and had only previously been attached to the search warrant application for that warrant (Defense Exhibit 3). *Id.* Additionally, on Defense Exhibit 9 the typewritten reference to "Attachment B" had been struck and changed to "Attachment E" with Faggert's initials indicating he made the alteration. *Id.* at 6. Importantly, as the above images indicate, only the unaltered warrant was filed with the clerk's office. (Defense Exhibit 4).

But Faggert could not say when that change to Attachment E on the warrant had occurred. *Id.* at 7. All he could say with any certainty was that his typical process would be to make changes or alterations in the presence of the judge. *Id.* Faggert had no explanation for why the warrant filed with the clerk's office and available on PACER did not contain the alteration. *Id.* Similarly, Faggert could not explain why the warrant that he filed with the clerk's office did not contain the attachments and he agreed that the filed warrant only contained reference to Attachments A and B. *Id.* at 12. On questioning by the United States as to whether those attachments were presented to the judge to obtain the warrant, Faggert testified: "All of the attachments were – should have been placed in front of the magistrate whenever we do the signing for the warrant. All the

attachments were there." *Id.* at 25. Faggert explained that he would have laid out a single copy of the warrant application affidavit (including Attachments A through E) and the one-page warrant before the magistrate. *Id.* at 27-29.

Nevertheless, while the search warrant filed in the case did not contain Faggert's alterations, the search warrant application filed in the case (Defense Exhibit 3) did contain his changes. *Id.* at 8-10, 29-30. Faggert would not agree that he altered the warrant outside the presence of the judge; only that he could not explain the discrepancy between the officially filed warrant (Defense Exhibit 4) and the warrant later disclosed to Davis (Defense Exhibit 9). *Id.* at 10. Faggert reiterated that the altered warrant (Defense Exhibit 9) with the Attachments A-E is what Faggert served on Google. *Id.* at 11. But, again, the warrant he served on Google did not have the timestamp from PACER.

The magistrate recommended that this motion be denied on two grounds. Doc. 138. First, the magistrate concluded that Davis lacked standing to challenge this warrant because he did not have a cognizable privacy interest in the Yonna Gmail account that was searched or the device on which the account was logged in. *Id.* at 17-18. The magistrate

19

rejected Davis' argument that he didn't need a privacy interest in the phone but only in the movements in question. *Id*. at 19. Second, the magistrate believed it had "no need to journey into the quagmire of geofence search warrants because even if Davis had a legitimate expectation of privacy in the area searched pursuant to the Google II Warrant, the *Leon*[3] good faith exception applies." *Id*. at 19.

### c. Trial

The United States' basic allegation was that on three different occasions, Davis would carjack someone and use that stolen vehicle to commit robberies at businesses around the area. The prosecution centered on three specific days involving three carjackings and four business robberies.

### i. January 23, 2020

Miangle Thomas was carjacked at her mother's house on Miriam Street in Montgomery around 10:00 pm as she got out of her car to pick up her grandkids. Doc. 226 at 90. As she began to put one of the children in the car, a man in a mask approached her and said, "I'm not going to do anything. All I want is the car. Just give me the car." *Id*. at 91. He told

---

[3] *United States v. Leon,* 468 U.S. 897 (1984).

her not to move. While he was talking to her, he "nodded his head down towards his waist side, and he had a gun." *Id.* at 92. The United States asked Thomas, "What did you think would have happened to you if you hadn't turned over the car?," to which she answered uncertainly, "I don't know. He could have shot me or – I don't know" *Id.*

Qshawn Rhodes was working at a Sunoco gas station on Carmichael Road on January 23rd, when someone came in the station and robbed them that night. *Id.* at 94-95. The robber was wearing a black mask and had a gun on him. *Id.* at 95. The jury saw a video recording of the robbery. *Id.* at 96.

Special Agent Jay Berni with the FBI testified about the investigations he did as part of the Cellular Analysis Survey Team (CAST). *Id.* at 97. Berni described to the jury how investigators can use cell phone tower data and information from Google to develop information about approximate locations for electronic devices, like cell phones. *Id.* at 98-107, 113-114. Berni explained that he investigated two numbers—one associated with Davis (ending in -1197) and one associated with Portia Gilbert (ending in -2401)—as well as one Gmail account to try and analyze location data for this case. *Id.* at 107, 109. A report on his findings was introduced

21

as Exhibit 17. *Id.* at 109. Berni explained that these two numbers and the Google account were in near proximity with each other and the locations where the carjacking, robbery, and the abandoning of the vehicle taken in the carjacking took place on January 23rd. *Id.* at 119. Additionally, the cell phone records demonstrated that the two numbers were communicating with each other during that evening's events. *Id.*

Vincent Rader lived on Alderpoint Drive in Montgomery on January 23rd. *Id.* at 135. Radar testified that law enforcement contacted him early that morning and asked for permission to review any footage he had from cameras positioned around his house. *Id.* He consented and turned over the video. *Id.* At trial, the United States played video (Exhibit 10) taken from Rader's cameras, in which you can see an individual running down the street. *Id.* at 136.

MPD Detective Adam Patterson testified about Comtex camera license plate reader footage from Cottingham Drive obtained in connection with this investigation. *Id.* at 50. Through Detective Patterson, the United States introduced a video recording (Exhibit 9) from January 23rd of a black Ford Fusion vehicle captured on the Comtex camera coming from

the Heatherton Drive neighborhood as it traveled towards Cottingham Drive. *Id.* at 52-53.

Faggert testified that the vehicle involved with the Miriam Street carjacking and the Sunoco robbery was dumped on Alderpoint Drive, only about a mile away from where Davis was ultimately arrested at 2312 Cottingham Drive. *Id.* at 148, 151. Through the license plate captured in Exhibit 9, law enforcement determined that the black Ford Fusion belonged to Stacey Gilbert, Portia Gilbert's sister. *Id.* at 150-151. In looking at Exhibit 10 again, Agent Faggert described a vehicle arriving near 1844 Alderpoint Drive, the arrival of a second vehicle off camera, and footage of someone running from the second vehicle to the first. *Id.* at 149.

Faggert explained that Davis later told him that the cell phone number ending in -1197 belonged to him. *Id.* at 155. Portia Gilbert purportedly told him that the Google account in question belonged to her daughter. *Id.* at 156.

### ii. October 30, 2020

Charles Rollins and his son had pulled up to his son's house after going to a football game on October 30th on Oak Shadow Lane in Montgomery when they were carjacked. Doc. 224 at 30. As they got out of the car to

switch seats, Rollins heard his son say, "ah," and he turned to see a masked man pointing two pistols in his son's face. *Id.* His son had just stepped out of the car from the driver's seat. *Id.* at 31. The person told Rollins to get back and told his son to run up the street. *Id.* Rollins ran after his son to get in between this person and his son "just in case he wanted to shoot." *Id.* The masked man jumped in the car (a black Dodge Charger) and sped off. *Id.* On cross-examination, Rollins admitted that he had made a statement to police which didn't include mention that the guns were pointed at anyone, let alone at anyone's face. *Id.* at 35. He reiterated that the person told him to "get back" and told his son to run but admitted that this person didn't verbally threaten him or say he was going to kill them. *Id.* at 35-36. On redirect, Rollins testified that he thought this person was probably going to shoot his son if he didn't give up the car. *Id.* at 36.

Benjamin Rogers was serving as the general manager of the Dollar General store located on Perry Hill Road in Montgomery in October 2020. *Id.* at 58. On the night of October 30th, he was at home when he received a call that the store had been robbed. *Id.* at 569. Through Rogers, the

24

United States admitted a security video that captured the robbery that night. *Id.* at 59-60 (publishing Exhibit 1).

Claranetta Bradley lived on Oak Shadow Lane. *Id.* at 43. As with Vincent Rader, law enforcement noticed that Bradley had security cameras set up at her house and asked Bradley for access to the footage, which she provided. *Id.* at 45. The footage (Exhibit 2) included two camera angles: a view of Oak Shadow Lane and a view of the alley behind her house. *Id.* In looking at the camera pointing towards the alley, Bradley described a car pulling in and turning around. *Id.* at 43-44. The footage also captures someone walking from the alley. *Id.* at 45-46.

Zachary Cottle, a former car dealership rental manager, testified that the FBI contacted him about a 2020 Ford Fusion that was rented out to Davis. *Id.* at 37-38. In looking at the rental paperwork (Exhibit 3-A), Cottle testified that that the contact telephone number listed for the rental agreement ended -1197. *Id.* at 38. Cottle explained that their rental vehicles (such as the one rented by Davis) are equipped with GPS monitors. *Id.* at 39, 40. Through Cottle the United States introduced the raw GPS coordinates of the vehicle (Exhibit 3-B) and a map of those coordinates for October 30th (Exhibit 3-C). *Id.* at 40-41.

Berni also testified to cellphone and GPS analysis he conducted concerning the October 30th carjacking and robberies. *Id.* at 119. In looking at Exhibit 17, Berni explained that cell phone towers located near the carjacking and robbery sites relayed calls from a phone ending in -1197 (associated with Davis) to a phone ending in -2401 (associated with Portia Gilbert). *Id.* at 120-121. Using the GPS data provided by Cottle, Berni created a map of the GPS coordinates for the Ford Fusion's movements on October 30th (Exhibit 12) around the time the carjacking took place. *Id.* at 121.

### iii. November 11, 2020

Alan Rivas was carjacked in the parking lot of a package store on Ann Street in Montgomery on November 11th. *Id.* at 64. Rivas had been delivering food that evening for DoorDash, a food delivery service. *Id.* He was sitting in his van when someone approached him, put a gun to his head, and said, "Don't think about it." *Id.* at 65-66. Rivas had served in the military and knew he had to acquiesce and get away. *Id.* at 67. He got out of the van but left a red DoorDash bag in the car. *Id.* The possibility of getting shot ran through his head. *Id.* at 68. On cross-examination, Rivas admitted that he didn't tell the police that interviewed him

after the carjacking that the carjacker pointed a gun at him but reiterated that a gun was, in fact, pointed at him. *Id.* at 71. He also admitted that even though he testified at trial that the carjacker had "dreads," he didn't tell the officer taking the report that his carjacker had dreads *Id.* Rivas confirmed that the carjacker didn't say he was going to kill him if he didn't get out of car. *Id.*

Walter Anderson and Jasmine Whitfield were inside the Fresh Market on the night it was robbed, and both encountered the robber. *Id.* at 72-76, 78-83. Anderson was in the store as a customer and Whitfield as an employee. *Id.* Anderson recalled the robber having a bag and Whitfield recalled that it was a red DoorDash bag. *Id.* at 73, 83. Anderson testified that the robber pointed the gun at him, and Whitfield testified that the robber had a gun but never pointed it at her. *Id.* at 75, 83.

Shawn Bennett was serving as the manager of the Dollar General located at 2679 Eastern Blvd in Montgomery in November 2020. *Id.* at 84. On the night of November 11th, he received a call that the store had been robbed. *Id.* at 85. Through Bennett the United States introduced a recording of the robbery (United States' Exhibit 6). *Id.* at 86.

27

Officer Donald Lowe of the MPD testified to video evidence he recovered during the investigation. Two of the videos came from license plate reader (LPR) cameras located on Calmar Drive (Exhibit 5) and on Ann Street near a Walmart (Exhibit 7). *Id.* at 53-56. Lowe also recovered security footage (Exhibit 22) from a camera located across the street from the package store where Rivas was carjacked. *Id.* at 57.

### iv. Davis' arrest and statement to investigators

Faggert testified that on October 30th, he applied for and received a search warrant to conduct "pings" of Davis' phone as, according to Faggert, Davis was the lead suspect in these carjacking-robberies. Doc. 224 at 157. After the carjacking on Ann Street and the robberies of Fresh Market and a Dollar General on November 11th, Faggert pinged Davis' phone and learned that his phone had been near the robbery of the Fresh Market and the Dollar General robbery. *Id.* at 158-159. Faggert immediately sought arrest and search warrants for Davis. *Id.* at 159. Faggert obtained warrants on November 12th, and arrested Davis that same day. *Id.* at 140-141.

After he was arrested, agents questioned Davis. *Id.* at 143. A video recording of this interview was admitted as Exhibit 19. *Id.* at 143. In the

interview, Davis admitted to carrying out the carjackings and the robberies on October 30th and November 11th but denied involvement in the January 23rd carjacking and robbery. *Id*. Davis told investigators that he committed these crimes because he had debts and needed money for bills. *Id*. Davis told investigators that while the gun he had used on November 11th was real, it did not have any bullets in it. *Id*.

## 3. Standard of Review

This Court reviews a denial of a motion to suppress under a mixed standard, reviewing findings of fact for clear error and reviewing *de novo* the application of the law to those facts. *See United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). This Court reviews the legal issues regarding whether the *Leon* good faith exception applies *de novo*. *United States v. Martin*, 297 F. 3d 1308 (11th Cir. 2002). This Court reviews challenges to the sufficiency of the evidence *de novo* but "views the evidence in the light most favorable to the government and draws all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007).

## SUMMARY OF THE ARGUMENT

The district court erred in denying Davis' requests that evidence be suppressed in his case. First, Davis had standing to challenge the warrant as his Google account was searched pursuant to this warrant and because he has a privacy interest in his movements, which were implicated by the evidence derived from this warrant. Second, the evidence presented in two of the suppression hearings demonstrated that law enforcement altered the Google warrant to satisfy blatant deficiencies. The warrant should have been suppressed on this unconstitutional alteration. Third, the district court erred in applying the *Leon* good faith exception to this warrant. Finally, the district court erred in concluding that Davis' right to presentment wasn't violated by improper federal and state collaboration when they obtained a statement more than 6 hours after his arrest in violation of Rule 5(a), Fed. R. Crim. P. The evidence presented below demonstrated that this investigation was federal in nature and would ultimately end up with a federal prosecution. That a state warrant was obtained and state charges brought (and were ultimately dismissed) does not undo the true nature of the law enforcement action here.

30

Davis is also due judgments of acquittal for all charges. A legally sufficient prosecution for carjacking requires the United States to present evidence that Davis intended to seriously harm or kill one of his victims if they didn't give him the car. The United States' case against Davis failed to show anything more than mere intimidation, especially when considered in the context of all his alleged crimes. Further, because a brandishing charge cannot stand without the substantive violent offense, his brandishing charges must too be rendered.

# ARGUMENT

## I. The district court erred in denying Davis' two motions to suppress evidence despite multiple violations of his Fourth Amendment rights.

Davis was prejudiced by the introduction of evidence seized pursuant to an unlawful geofence warrant and a video-recorded statement obtained in violation of his constitutional rights. Davis demonstrated multiple instances of unlawful actions by law enforcement including obtaining an unconscionably broad and baseless geofence warrant, officer manipulation of that warrant, and improper collaboration between federal and state law enforcement that denied Davis his right to presentment. All claims warranted relief. Accordingly, this Court should reverse the denials of Davis' motions to suppress.

### A. The district court should have suppressed the fruits of the Google warrant.

The Google warrant suffered from several flaws, all of which warranted the suppression of evidence seized pursuant to the warrant. The district court disagreed but erred in multiple ways to reach that conclusion. This Court should reverse the district court's denial of Davis' efforts to suppress the Google warrant in this matter.

32

**1. Davis had standing to challenge this warrant.**

The district court denied Davis' motion to suppress the evidence seized pursuant to the Google warrant after concluding that he did not have standing to challenge the search. Specifically, the court concluded that Davis did not have a privacy interest in the data seized from a Google account that didn't belong to him. This ruling was erroneous because (1) Davis as Google account holder was undeniably implicated in the initial search authorized by the massively broad warrant, and (2) Davis possessed a privacy interest in the tracking of his movements through the movements of an unindicted co-conspirator with whom Davis was working.

To challenge the reasonableness of government action under the Fourth Amendment requires consideration of whether the search or seizure in question infringes on privacy interests that our society recognizes as reasonable. *See Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018). "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969).

33

As to a reasonable expectation of privacy, "the Fourth Amendment protects **people, not places**." *Katz v. United States*, 389 U.S. 347, 351 (1967) (emphasis added). This means that the question of "standing" does not depend on the search location per se; instead, the focus must be on whether the challenger has a legitimate expectation of privacy in the location searched. *Byrd*, 138 S. Ct. at 1526. Again, a legitimate privacy expectation is one that "society is prepared to recognize as reasonable." *Minnesota v. Olson*, 495 U.S. 91, 95-96 (1990). Put differently in *California v. Ciraolo*, 476 U.S. 207, 211 (1986), the Court explained this inquiry as a two-step process: "*Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)); *see also United States v. Maxi*, 886 F. 3d 1318, 1325 (11th Cir. 2018) ("In order to have standing to seek suppression of evidence, a defendant must establish both a subjective expectation of privacy in the place searched as well as the objective reasonableness of that expectation.").

Historical understanding of unreasonable searches under an originalist interpretation of the Fourth Amendment is foundational to the reasonableness of government action considering increasing use of technological methods of surveillance. *See Carpenter v. United States*, 138 S. Ct. 2206, 2214-15 (2018). This understanding brings forth two guiding principles:

> On this score, our cases have recognized some basic **guideposts**. First, that the Amendment seeks to secure "the privacies of life" against "arbitrary power." *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Second, and relatedly, that a central aim of the Framers was "to place obstacles in the way of a **too permeating police surveillance**." *United States v. Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948).

*Id.* at 2214 (emphasis added).

Of course, whether a person has a reasonable expectation of privacy that society recognizes is not determined by any set of predetermined factors:

> Although the Court has not set forth a single metric or exhaustive list of considerations to resolve the circumstances in which a person can be said to have a reasonable expectation of privacy, it has explained that "[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."

35

*Byrd*, 138 S. Ct. at 1527 (quoting *Rakas v. Illinois,* 439 U.S. 128, 144 n. 12 (1978)). Aside from concepts of property law and physical intrusions, the Court has analyzed expectations of privacy in location and movement under the Fourth Amendment. *See Carpenter*, 138 S. Ct. at 2214-15.

In *Carpenter*, the United States Supreme Court addressed cell-site location information (CSLI) that the government accessed to compile a detailed record of the cell-phone user's movement. *Carpenter*, 138 S. Ct. at 2211. It held "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." *Id.* at 2217. In doing so, the Court rejected an application of the third-party doctrine under *United States v. Miller*, 425 U.S. 435, 443 (1976) and *Smith*, 442 U.S. at 742, determining that these cases had not considered the advent of cell phone records that could relay continuous movements. *Carpenter*, 138 S. Ct. at 2216-17.

In fact, the continuous nature of intrusion that occurs when the government obtains CSLI records to monitor *location* drove the Court's analysis in *Carpenter*:

> Given the unique nature of cell phone location records, the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection. Whether the Government employs its own surveillance technology as in [*United*

36

*States v.*] *Jones* [, 565 U.S. 400 (2012)] or leverages the technology of a wireless carrier, **we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI. The location information obtained from Carpenter's wireless carriers was the product of a search.**

*Id.* at 2217 (emphasis added).

Granted, the Court in *Carpenter* addressed the appellant's privacy interest in data derived from his cell phone records and not another source. Here, the movements discovered through the Google warrants were tied to Davis' girlfriends' phone. But this distinction is not fatal to Davis for two reasons: the warrant at its inception implicated his privacy interests and the data recovered implicates a reasonable privacy interest.

First, it must be recognized that the warrant authorized the search of Davis' Google account. In the May 3rd suppression hearing, Faggert explained that the Google warrant effectively directed Google to look through every user account in their user database to find which accounts were in the locations specified at the detailed times. Doc. 120 at 12. Davis argued that he had standing to challenge this warrant since he was a Google account holder. Doc. 135 at 58; Doc. 116. Thus, at the moment the warrant was issued, Davis' privacy interests were implicated by the search of Davis' location history through GPS coordinates. *See United*

*States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring) ("GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."). The court below erred in rejecting this theory of standing.

Second, Davis has a reasonable expectation that society recognizes in his physical location and movement regardless of whether he had a possessory interest in the device used to track his location and movement. The protected interest here is not the device: it is the location and movement itself.

*Carpenter* recognized as much in its discussion of a privacy interest, even when in public spaces, that is tied to physical location opposed to a specific device:

> A person does not surrender all Fourth Amendment protection by venturing into the public sphere. To the contrary, "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz,* 389 U.S., at 351–352, 88 S. Ct. 507. A majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements. *Jones,* 565 U.S., at 430, 132 S. Ct. 945 (ALITO, J., concurring in judgment); *id.,* at 415, 132 S. Ct. 945 (SOTOMAYOR, J., concurring). Prior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so "for any extended period of time was difficult and costly and therefore rarely undertaken." *Id.,* at 429, 132 S. Ct. 945 (opinion of

38

Alito, J.). For that reason, "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." *Id.,* at 430, 132 S. Ct. 945.

Allowing government access to cell-site records contravenes that expectation. Although such records are generated for commercial purposes, *that distinction does not negate Carpenter's anticipation of privacy in his physical location.* Mapping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts. As with GPS information, the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his "familial, political, professional, religious, and sexual associations." *Id.,* at 415, 132 S. Ct. 945 (opinion of SOTOMAYOR, J.). These location records "hold for many Americans the 'privacies of life.' " *Riley,* 573 U.S., at ——, 134 S.Ct., at 2494–2495 (quoting *Boyd,* 116 U.S., at 630, 6 S. Ct. 524). And like GPS monitoring, cell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools. With just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense.

*Id.* at 2217-18.

Thus, just as Carpenter possessed a legitimate privacy interest in historical cell phone records used to track his every move, so does Davis. Even though his movement was tracked through his girlfriend's device, the two were moving in unison as part singular purpose: her movements were his and vice versa. Through the lens of *Capenter*, a distinction between the two's movements is meaningless. Gilbert would undoubtedly

39

have a privacy interest in her movements under *Carpenter* and so would Davis given their unity of movement. That Davis did not manage the Google account actually tracked but used to ultimately identify his movement is of no consequence. Under the *Carpenter* Court's focus on location and movement and the *Katz* Court's recognition that the Fourth Amendment protects people, not things (i.e., the Google account or phone), Davis has a privacy interest that is recognizable here. As such Davis had standing to challenge the legality of the Google search.

## 2. Faggert's alteration of the warrant without judicial authorization warrants suppression of the evidence seized pursuant to the Google warrant.

The Fourth Amendment imposes a four-part test for a proper warrant: (1) probable cause; (2) sworn support; (3) particularly described places to be searched; and (4) particularly described persons or things to be seized. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). In Davis' case, the United States failed to comply with the fourth requirement: particularly describing the things to be searched.

Faggert realized this failure and changed the warrant. While he testified this alteration likely took place in front of the issuing magistrate, the evidence presented below demonstrates that it is just as likely that

40

Faggert changed the warrant outside the presence of the magistrate. Because the record cannot conclusively show that Faggert made a necessary alteration in the presence of the magistrate, the United States failed to meet the particularity requirement of the issuance of this search warrant.

*Groh* involved a *Bivens*[4] action brought against the officers who executed a "plainly invalid" search warrant." *Id.* at 555-57. In that case, the search warrant lacked any language specifying the things to be searched or seized. *Id.* at 554. Nor did the warrant incorporate by reference a list of specified items from the warrant application. *Id.* at 554-555. The Court explained that while cross-referencing other documents is permissible under the Fourth Amendment to satisfy the particularity requirements, the warrant must "use appropriate words of incorporation" and the incorporated documents must accompany the warrant. *Id.* at 557-58. Without those appropriate word and documents, an "application that adequately describes the things to be seized does not save a warrant from its facial invalidity because the Fourth Amendment by its terms requires

---

[4] *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388 (1971).

41

particularity in the warrant, not in the supporting documents." *Id.* at 557 (cleaned up).

To illustrate this point, the Court in *Groh* explained:

But unless the particular items described in the affidavit are also set forth in the warrant itself (or at least incorporated by reference, and the affidavit present at the search), there can be no written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit. See *McDonald,* 335 U.S., at 455, 69 S.Ct. 191 ("Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. . . .).

*Id.* at 560. From this analysis, the focus must be on the description of the items to be searched for as contained or referenced in the warrant itself. *See id.* For a perfectly completed search warrant affidavit "cannot save a facially defective warrant." *United States v. Pratt*, 438 F.3d 1264, 1269-70 (11th Cir. 2006).

Moreover, a warrant that fails to comply with the particularity requirement is unconstitutional. *Massachusetts v. Sheppard*, 468 U.S. 981, 988, n. 5 (1984). This constitutional violation stems from the fact that even if the agent executing the warrant "acted with restraint in conducting the search, 'the inescapable fact is that this restraint was imposed by the agents themselves, not a by a judicial officer.'" *Groh*, 540 U.S. at 561 (quoting *Katz*, 389 U.S. at 356).

42

This same problem exists when the agent seeking the warrant later detects a flaw in the warrant and does not tell the magistrate who endorsed and issued the warrant. *Groh*, 540 U.S. at 561. As the Court explained:

> In this case, by contrast, petitioner did not alert the Magistrate to the defect in the warrant that petitioner had drafted, and we therefore cannot know whether the Magistrate was aware of the scope of the search he was authorizing. Nor would it have been reasonable for petitioner to rely on a warrant that was so patently defective, even if the Magistrate was aware of the deficiency.

*Id.* at 561, n. 4; *see also Brown v. Byer,* 870 F.2d 975, 978-79 (5th Cir. 1989) (an officer may not alter a warrant after it has been issued in an attempt to particularize it).

That only a judicial officer may correct a warrant follows from Rule 41(b), Fed. R. Crim. P., which grants the authority to issue warrants to the court and not law enforcement. *See e.g. Johnson v. United States*, 333 U.S. 10 (1946) (recognizing that the Fourth Amendment requires warrants to be issued by a neutral and detached magistrate); *Coolidge v. New Hampshire*, 403 U.S. 443 (1971) (holding that the aforementioned requirement is not satisfied if the warrant is issued by the chief law enforcement agent of a state). Other jurisdictions explicitly recognize this principle and require that any alteration of correction be made with

43

judicial approval. *E.g. United States v. Katoa*, 379 F.3d 1203, 1208 (10th Cir. 2004) (holding that a defective warrant could be corrected through judicial authorization obtained by phone and later confirmed in writing); *United States v. Arenal*, 768 F.2d 263, 267 (8th Cir. 1985) (approving address corrections made to a warrant before execution with the oral permission of the issuing judge, which the judge later initialed); *United States v. Bowler*, 561 F.2d 1323, 1326 (9th Cir. 1977) (holding the magistrate's correction of a clerical error was "perfectly proper"); *State v. Yoder*, 96 Idaho 651, 653, 534 P.2d 771 (1975) (recognizing that only a judicially approved correction to a warrant will maintain the warrant's validity); *Hernandez v. People*, 153 Colo. 316, 324, 385 O.2d 996, 1001 (1963) ("[O]nly a judicial officer may issue the search warrant, it is axiomatic that the right to alter, modify, or correct the warrant is necessarily vested only in that authority. It follows that the alteration in the instant case was a usurpation of the judicial function and, therefore, improper.")

Granted, not all defects identified in warrants result in application of the exclusionary rule:

> The warrant need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his

44

authority. An erroneous description of premises to be searched does not necessarily render a warrant invalid.

*United States v. Burke*, 784 F.2d 1090, 1092 (11th Cir. 1986).

Take, for example *Burke*, which involved an address error in a search warrant that did not result in the wrong location being searched under the circumstances. *Id.* In *Burke*, the warrant contained an incorrect street address, but contained the correct apartment number and detailed description of the intended premises. *Id.* Under these facts, the Eleventh Circuit held "the search warrant described the premises to be searched with sufficient particularity to direct the officers to the correct apartment, to confine the officers' examination to that apartment, and to place the occupants on sufficient notice of the officers' authority to search the premises." *Id.* at 1093.

In contrast to the type of search warrant error in *Burke* that did not affect the intended target of the search, Davis' case contains precisely the sort of flawed particularity and an attempt to later correct it seen in *Groh* that eliminated the required checks and balances of submitting the flaw to judicial authority.

Initially, Davis sought to suppress the Google warrant on grounds that it lacked the particularity required by the Fourth Amendment. *See* Doc.

45

110. But at the initial hearing held on this motion, along with the particularity issue, certain unexplained discrepancies arose during Faggert's testimony regarding the March 9, 2020, search warrant application and its attachments (Defense Exhibit 3) and the accompanying warrant (Defense Exhibit 4). Doc. 120 at 31-36.

Faggert was able to explain the typical practice in obtaining a warrant, which also included the step of immediately taking the signed warrant and supporting documents to the clerk's office to file in the case. Doc. 135 at 30. As to the Google warrant filed with the district court in Davis' case (Defense Exhibit 4) and retrieved from PACER, Davis established that it referenced two attachments, Attachment A and Attachment B. *Id.* at 29. But these two attachments were not appended to the version of the warrant retrieved from PACER. *Id.* at 30. Significantly, Attachment E, "the items to be seized and searched by Google," was not referenced in the filed warrant in any way. Doc. 120 at 29-30, 31. Faggert couldn't explain why the version filed with PACER would not have the two attachments referenced in the warrant itself—again, Attachment A and B. *Id.* at 30-33.   In the May 25th portion of the hearing, Faggert couldn't explain when the alteration of the attachment reference occurred. Doc. 135

46

at 7. Faggert stood on his testimony that he only made changes in front of a judge, but he could not unequivocally say that he did that here. *Id.*

Faggert's testimony that he typically made changes and initialed them on search warrants or warrant applications in the presence of the judge did not answer the question of whether Faggert improperly altered the warrant he presented to the judge by later changing it to incorporate Attachment E. *See id.* at 7. And although Faggert had no specific memory of the Google warrant at issue, *see id.* at 8, the only reasonable reading of his testimony is that the warrant served on Google was impermissibly altered outside the presence of the issuing judge. The United States' initial argument on the matter appeared to agree that Faggert altered the warrant outside the judge's presence: "It would seem that the change to the warrant was simply made at some point, could have been minutes after, but at some point after the signed warrant was filed with the clerk's office." *Id.* at 55-56.

Contrary to the Government's argument otherwise, this alteration requires exclusion. *See id.* at 56-57. This is so because the warrant approved by the judge did not incorporate Attachment E. Without such judicially approved incorporation, the warrant itself did not meet the

47

particularity requirement of describing the things to be searched. *See Groh*, 540 U.S. at 557. There is nothing about the search warrant affidavit that can save the Government's failure to present the issuing judge with a warrant describing the items to be searched. *See Pratt*, 438 F. 3d at 1269-70.

And the alteration here is not comparable to the type of mistake addressed in *Burke* that had no effect on the premise to be searched even if the warrant contained an incorrect address. Instead, without any incorporation to Attachment E at the time the judge approved the warrant, the warrant failed to describe any search at all.

In sum, Faggert realized that the attachments referenced in the warrant were incorrect and changed them. *See* Doc. 135 at 35-36. The change included a necessary reference to Attachment E—which laid out the particularized list of items to be seized and searched. This attachment, however, was not incorporated in the warrant presented to the magistrate judge—and therefore, lacked any of the judicial blessing required by the Fourth Amendment. As a consequence, the search warrant was invalid and unconstitutional in violation of the Fourth Amendment.

48

### 3. Good faith under *Leon* should not apply to a warrant process that suffered from so many Fourth Amendment failings.

In Davis' case, the good faith exception has no application and does not salvage the violation of his Fourth Amendment rights.

The Eleventh Circuit has explained that *Leon* and the good-faith exception "stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant" later found to have been lacking in probable cause. *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002). The good-faith exception, however, has four exceptions itself:

(1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth";

(2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in" *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979);

 (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and

(4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* (internal quotation marks omitted).

49

*Id.* (quoting *Leon*, 468 U.S. at 923).

Several exceptions apply here. The massive scope of this Google warrant coupled with the lack of evidence specific to this case as well as the magistrate's delegation of supervisory responsibility to law enforcement should lead this Court to conclude good faith deference isn't warranted here.

### a. The warrant abdicated judicial responsibility in favor of law enforcement discretion.

It cannot be said that magistrate here occupied the proper role between law enforcement and the subject of a search. Instead of making sure that law enforcement had probable cause to continue their investigation where law enforcement admitted additional searches would be necessary, the magistrate authorized an effective general warrant to law enforcement and then signed over its gatekeeper role to officers to continue rummaging through Google's information as it pleased. This delegation simply wasn't reasonable. The magistrate's failure to maintain a check-and-balance between the steps of the warrant process as described by the warrant application should prevent this Court from applying the good faith doctrine.

As discussed earlier, Faggert testified about the various steps the warrant process would require before Google would ultimately turnover specific account information. However, the magistrate would not be involved in this critical and potentially case-making step. Instead, the magistrate signed over to Faggert and investigators the discretion to move ahead as they saw fit with the fruits of their expansive search through Google's records. No detached magistrate would stand between them and Google in finding out user information after the first step in the warrant process.

First, this Court should conclude that the warrant authorized was nothing more than a general warrant due to the massive scope of what was authorized. This Court has explained:

> The requirement that warrants particularly describe the place to be searched and the things to be seized makes general searches under them impossible. *Id.* at 512. A warrant which fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally over broad. *Id.* The resulting general search is unconstitutional. In order to deter such warrants and searches, the Court has held that any evidence so seized must be excluded from the trial of the defendant. *Stone v. Powell,* 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

*United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000). Here, the breadth and scope of the search is so vast that it's impermissible.

Second, the warrant called for such a massive search that it was patently unreasonable to authorize what law enforcement requested. The application called for Google to search through enormous geographic segments. The magistrate authorized these requests although innocent devices were inevitably going to be searched. Further, the warrant was directed to the entirety of Google's user base.

Finally, the problem of the scope of the warrant is compounded by the magistrate's abdication from the process. The magistrate abandoned his judicial role in granting such immense discretion to Faggert to decide which users' data to search and seize in Steps 2 and 3. As in *Lo-Ji Sales v. New York*, the magistrate abdicated his authority by leaving the determination of what to seize up to the executing officers. 442 U.S. 319, 326-27 (1979). The Fourth Amendment, however, "does not permit such action," nor such "open-ended warrants." *Id.* at 325. Rather, it demands that a neutral and detached magistrate make decisions about what to search and what to seize. This constitutional function may not be outsourced to Google or to the police. But that is what the magistrate did here. He abandoned his judicial role, and the good-faith exception should therefore not apply.

**b. The warrant completely lacked an indicium of probable cause justifying a search through the entirety of Google account-holder information.**

The Google warrant application lacked a critical touchstone for probable cause: a reasonable belief that a phone was used by the perpetrator.

Faggert did not know if the person committing these offenses had or used a cell phone. The warrant application didn't allege that a phone was being used. Instead, it only alleged that "[i]f the perperator(s) …was in possession of a cell phone which had an Android operating system, it is likely that Google is in possession of information that could lead to the identification of the perpetrator(s)." Doc. 110-3. Thus, when he applied for the warrant Faggert had no basis for alleging that such a search might uncover probative evidence for these offenses because he had no idea if a phone was used at all.

In *Martin* this Court explained:

> "It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Hove,* 848 F.2d 137, 140 (9th Cir.1988) (As "the affidavit offer[ed] no hint as to why the police wanted to search [the] residence" and why they believed they would find incriminating evidence there and there was no link between the location and the defendant, any official belief that the warrant established probable cause was unreasonable.). "The focus in a warrant application is usually on whether the suspect committed a crime and whether

53

evidence of the crime is to be found at his home or business." *United States v. Procopio,* 88 F.3d 21, 28 (1st Cir.1996). Thus, the affidavit must contain "sufficient information to conclude that a fair probability existed that seizable evidence would be found in the place sought to be searched." *Pigrum,* 922 F.2d at 253.

*Martin*, 297 F.3d at 1314.

Pursuant to *Leon*, this Court has recognized that "the affidavit must not be a "bare-bone" statement of nothing more than conclusory allegations." *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998). Further, in assessing challenge to probable cause, this Court is limited to the "four corners" of a search warrant affidavit. *See United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982) ("In passing on the validity of the warrant, consideration may be given only to information brought to the attention of the magistrate."); *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) ("Review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit.").

This warrant application is nothing more than a "bare bones" affidavit in that it's merely conclusory and not particular to the offenses or suspect at hand. Within the four corners of this application, the magistrate had nothing to rely upon to find probable cause that the search would uncover

evidence of these offenses. The facts Faggert described in the application did not explain how this warrant process **in this particular case** would likely uncover relevant evidence of these crimes. Faggert had no way of knowing if a phone or other device was used during the crimes or was near the crimes. His application basically set out a guess and hope: if a phone was used, possessed, or near the crimes, this warrant may help us find out relevant information. Faggert simply failed to lay the ground-work for a neutral magistrate to find that the warrant should issue here.

### c. Investigators should have known that the warrant in hand was unconstitutional.

This warrant should never have been issued with all its problems and deficiencies. Even so, Faggert and the investigators here should not be able to benefit from the warrant they drafted. In determining whether any of the *Leon* good faith exceptions apply, this Court must look to the totality of the circumstances surrounding the issuance of the warrant. *United States v. Accardo*, 749 F. 2d 1477, 1481 (11th Cir. 1985); *see also United States v. Taxacher*, 902 F. 2d 867, 871-72 (11th Cir. 1990) (dis-cussing consideration of the totality of the circumstances from the per-spective of a reasonable officer). This encompassing view is even more

critical to evaluate whether the fourth exception to any application of good faith may apply here.

That fourth exception to a finding of good faith from *Leon* provides, "a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. Here, it is the cumulative effect of the deficiencies that lead to the conclusion that Faggert could not have reasonably presumed the warrant's validity. These deficiencies included:

- Faggert's alteration of the warrant without judicial approval;

- A total lack of probable cause to seize phone or device data when Faggert had no reasonable belief that any phone or device was used during the offenses; and

- The breadth of the warrant. which allowed a multi-step search process at the direction of law enforcement and not the judiciary.

The companion case to *Leon*, *Sheppard*, 468 U.S. at 983, is instructive on whether Faggert could have reasonably presumed the validity of the Google warrant. In *Sheppard*, the Court evaluated whether *Leon* would apply "to a situation in which police officers seize items pursuant to a

56

warrant subsequently invalidated because of a technical error on the part of the issuing judge." *Id.* at 983-84. As to that technical error, the Court explained that police repurposed a controlled substance warrant application form in *Sheppard* to obtain evidence in a murder investigation. *Id.* at 984-85. Law enforcement knew the form would the controlled substance references removed and alerted the judge to this issue resulting in judicially approved modifications. *Id.* at 986. The problem was that not all controlled substance references were removed from the warrant and the form used did not reference an affidavit. *Id.*

Thus, the Court considered whether "officers reasonably believed that the search they conducted was authorized by a valid warrant." *Id.* at 988. In rejecting application of the exclusionary rule and concluding that officers acted reasonably in *Sheppard*, the Court focused in on the fact that "officers . . . took every step that could reasonably be expected of them." *Id.* at 989. This included the step that officers informed the issuing judge of the necessary modifications to the search warrant *and the judge indicated that all necessary changes would be made. Id.* While not all modifications were made, the Court observed "there is little reason why [police] should be expected to disregard assurances that everything is all right,

57

especially when [they have] alerted the judge to the potential problems." *Id.* at 990. Thus, when the judge told officers all changes would be made, it was reasonable for officers to rely on that assertion.

Like Davis' case, *Sheppard* dealt with modifications to a warrant. But unlike law enforcement in *Sheppard*, Faggert did not take every reasonable step in obtaining the warrant at issue. Unlike the officers in *Sheppard*, Faggert *did not alert* the magistrate to issues with the warrant and the attachments or a need to alter the warrant to include reference to Attachment E. Thus, unlike *Sheppard*, there was no assurance from the judiciary that the warrant would be perfected. Instead, the most reasonable interpretation of the record at hand is that Faggert realized that the warrant needed to be altered to reference Attachment E *after* the magistrate reviewed it and signed it and *after* Faggert filed the version presented to the magistrate with the clerk. The judicial assurances of a valid and corrected warrant from *Sheppard* just do not exist in Davis' case. And Faggert knew it.

But that is not all that Faggert knew. He also knew that the warrant lacked the particularity required under the constitution for the warrant to issue. Because Faggert prepared the warrant and accompanying

documentation, he could not simply fail back on a judicial assurance that it was sufficient and valid. As *Groh*, 540 U.S. at 552, explains:

> Given that the particularity requirement is stated in the Constitution's text, no reasonable officer could believe that a warrant that did not comply with that requirement was valid. Moreover, because petitioner prepared the warrant, he may not argue that he reasonably relied on the Magistrate's assurance that it contained an adequate description and was valid.

Moreover, the lack of probable cause and particularity, discussed above and involved in Davis' case, cannot be compared to this Court's decision in *United States v. Blake*, 868 F.3d 960, 974-75 (11th Cir. 2017), which applied good faith to officers' reliance on arguably non-particularized warrants for Facebook account data. While this Court indicated that the Facebook warrants at issue in *Blake* could have been more narrowly tailored to obtain evidence of messages between certain suspected sex workers and their customers, it applied the good faith exception for two independent reasons not present in Davis' case. *Id.* at 975-76.

First, the *Blake* warrants *did* contain sufficient specific probable cause unlike the geofence warrant here that lacked any indication of a cell phone or device being used during the offenses. *See id.* Second, in *Blake*, this Court concluded that the particularity issue was not a clear violation noting "while the warrants may have violated the particularity

59

requirement, whether they did is not an open and shut matter; it is a close enough question that the warrants were not 'so facially deficient' that the FBI agents who executed them could not have reasonably believed them to be valid." *Id.* at 975.

Davis' case isn't a close call. Faggert had in hand a multi-step search warrant for all Google account users without any knowledge that the suspects had devices with them let alone Google accounts. As his testimony recognized, the search parameters he chose to include would sweep up Google account holders passing through the area, at work, conducting business, or even in their homes. Doc. 120 at 23-24.

Under the totality of the circumstances and from the perspective of a reasonable officer, Faggert could not have reasonably presumed the geofence warrant to be valid. This is based on the Attachment E alteration he made without judicial approval, a total lack of probable cause to connect a device or Google account to the offenses, and due to the sweeping nature of the warrant that allowed multiple returns of data at the discretion of law enforcement.

## B. Davis' confession to law enforcement was due to be suppressed because officers violated his right to a timely presentment under federal law.

Davis filed a motion to suppress his statements to state and federal investigators based on a presentment violation. Specifically, Davis argued that while he was initially arrested under state warrants and charged under state law, this investigation and ultimate prosecution was federal in nature and not a true state-federal dual-track prosecution. As such, Davis had a right to timely presentment before a magistrate under Rule 5(a), Fed. R. Crim. P. and 18 U.S.C. § 3501 and that right was violated here. Because the district court erred in concluding that this wasn't a federal investigation merely because Davis was arrested on state warrants and charges, this Court must reverse.

The first of three suppression hearings held in Davis' case considered the presentment issues. At this hearing held on February 10, 2022, Faggert acknowledged that federal efforts were necessary for this process, but downplayed the idea of an inevitable federal prosecution was going to come from Davis' arrest. Incredibly, Faggert testified that at the time of Davis' arrest (November 12, 2020), authorities weren't intending to make a federal case against Davis unless they had more facts to

present to the United States Attorney's office. Doc. 113 at 60. Such a statement strains credulity based on what Faggert had just testified to, let alone the repeated focus of federal crimes as the basis for their warrant requests over the years. Faggert, minutes before, admitted that they had enough evidence based upon the investigations surrounding the January 23rd and October 30th events to arrest Davis. *Id.* at 58. As of July 31, 2020, Davis was the "lead 'person of interest'" per Faggert's own description. Doc. 113 (as described in Defendant's Exhibit 8, an FBI 302 report written by Faggert).

Evidence admitted during the February 10th hearing (as well as the other hearings) demonstrated that investigators routinely and repeatedly obtained court orders and warrants from a federal judge in connection with this investigation. In both affidavits in support of the December 2018 and March 2020 Google search warrants, Faggert listed federal offenses as the offenses related to the request. *See* Doc. 110-1 (December 2020 warrant referencing a robbery offense under 18 U.S.C. § 1951) and Doc. 110-3 (March 2020 warrant referencing carjacking (18 U.S.C. § 2119) and robbery (§ 1951)).

In the February 10th hearing, Davis introduced several FBI 302 forms demonstrating the extensive involvement of federal authorities in this investigation. These forms memorialized Faggert's efforts to obtain court orders and search warrants from judges in the Middle District of Alabama for information from multiple cell phone providers, including T-Mobile, AT&T, Verizon, and Sprint, as well Davis' Facebook accounts and email address believed to be connected to Davis. Doc. 113 at 18-27. At trial Faggert testified to how he applied for and received a search warrant to "ping" Davis' phone, which appears to have been authorized by a federal court. Doc. 224 at 158; *see also* Doc. 113 at 28 (referencing Defendant's Exhibit 15). The insinuation that the investigation into this carjacker/robber wasn't going to end up in federal court simply cannot be reconciled with the investigative efforts of this case.

Further, Faggert's own words to Davis after his arrest plainly demonstrate how Faggert knew Davis' case would be prosecuted federally. At one point, Faggert tells Davis, "The federal government recognizes acceptance of responsibility." Doc. 224 (admitting United States' Exhibit 19 – Davis' interrogation and statement). Yet, Faggert maintained in the first suppression hearing that they had no intention of making this a

federal case and "were only pursuing the charges as State charges until we had more facts that we could present to the U.S. Attorney's Office supporting our—our conclusion that Davis is our suspect." Doc. 110 at 60. Finally, Faggert admitted on the record that the state charges had been no-billed by the grand jury in the state proceedings. Doc. 113 at 85.

After conducting a hearing on Davis' motion to suppress, the magistrate judge recommended that the motion to suppress be denied on multiple grounds; however, the district court ultimately adopted only two of the reasons: that Davis' presentment rights weren't implicated because he was arrested on a state warrant and because Davis failed to show there was no improper collaboration between state and federal authorities. Doc. 117; Doc. 142.

Modern presentment issues sit at the intersection of the common law, Rule 5(a), Fed. R. Crim. P., and 18 U.S.C. § 3501. Davis' case presents this Court with an even rarer issue: a federal presentment issue involving an initial arrest and charges by state investigators where there is a legitimate question of whether (1) there were dual-track state and federal investigations occurring or (2) this investigation was really only federal in nature and actually heading towards a federal prosecution. If the case

64

falls into the latter situation, Davis has a federal right to presentment that has been violated. In the former situation, however, Davis' rights could only be vindicated if he can prove improper cooperation between state and federal authorities. This scenario provides this Court with an issue of first impression given new guidance from the United States Supreme Court and changes in federal statutory law.

Among the principles retained from the common law was presentment: that an arresting officer was obliged "to bring his prisoner before a magistrate as soon as he reasonably could." *Corley v. United States*, 556 U.S. 303, 306 (2009). Presentment served as a safeguard against secret detentions and "the evil implications of secret interrogations of persons accused of crime." *McNabb v. United States* 318 U.S. 332, 344 (1943)); *see also Corley*, 556 U.S. at 306-310 (exploring the history of the presentment requirement, including *McNabb*, Rule 5, and § 3501).

In *McNabb*, the Supreme Court considered whether the various federal statutes addressing presentment required the exclusion of confessions obtained when investigators held and questioned the defendants for days before they were formally charged. *McNabb*, 318 U.S. at 334-338. As the Court explained:

65

> [I]n their treatment of the petitioners the arresting officers as-
> sumed functions which Congress has explicitly denied them. They
> subjected the accused to the pressures of a procedure which is
> wholly incompatible with the vital but very restricted duties of the
> investigating and arresting officers of the Government and which
> tends to undermine the integrity of the criminal proceeding.

*Id.* at 341-42. Moreover, "the purpose of this impressively pervasive re-
quirement of criminal procedure is plain. A democratic society, in which
respect for the dignity of all men is central, naturally guards against the
misuse of the law enforcement process." *Id.* at 343 (cleaned up). As a re-
sult of the Court's decision, the *McNabb* Rule requires the exclusion of
any confession made when arresting officers fail to ensure an arrestee is
"promptly taken before a committing authority." *Id.* at 342; 346.

The presentment rule was later simplified and codified as Rule
5(a)(1)(A) in the Federal Rules of Criminal Procedure. *Corley*, 556 U.S. at
307-08. Under Rule 5(a)(1)(A), "a person making an arrest within the
United States must take the defendant without unnecessary delay before
a magistrate judge, or before a state or local judicial officer..." As the Su-
preme Court later explained, the *McNabb* Rule and Rule 5(a) work in
tandem. *See e.g., Upshaw v. United States*, 335 U.S. 410, 412-13 (1948);
*Mallory v. United States*, 354 U.S. 449, 353-56 (1957).

In addition, § 3501 concerns the admissibility of confessions and was initially enacted by Congress in response to the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966). *Corley*, 566 U.S. at 309-10. Section 3501(c) creates a six-hour safe harbor window for officers to bring a defendant before a magistrate—within that window, confessions are presumptively admissible. Davis recognizes, however, that typically federal presentment rules only apply under § 3501 once a defendant has been charged and arrested under federal law. In *United States v. Alvarez-Sanchez*, 511 U.S. 350 (1994), the Supreme Court rejected an argument that § 3501(c)'s six-hour window applies when a defendant has been arrested on state charge, explaining that "[a]s long as a person is arrested and held only on state charges by state or local authorities, the provisions of § 3501(c) are not triggered." *Id.* at 358. But the Court acknowledged in its conclusion that an exception exists when state authorities improperly collaborate with federal authorities in a manner that allows federal authorities to interrogate a defendant without having to worry about presentment requirements. *Id.* at 359. This exception is rooted in *Anderson v. United States*, 318 U.S. 350 (1943)—which was released the same day as *McNabb*—and long predates § 3501(c).

67

In *Anderson*, a local sheriff took the initiative to arrest striking mine workers after someone dynamited nearby power lines feeding the company against whom the strike was directed. *Anderson*, 318 U.S. at 352. While the men were being held by state officers, they were interrogated by federal officers over a period of six days and ultimately made confessions without being taken before any magistrate or other committing officer, as required by Tennessee law. *Id.* Looking to *McNabb*, the Court concluded that even though the federal officers weren't guilty of the illegal conduct of failing to present the suspects as required by Tennessee law, their confessions were still due to be suppressed because "[t]here was a working arrangement between the federal officers and the sheriff of Polk County which made possible the abuses revealed by this record." *Id.* at 356.

This Court (then the Fifth Circuit Court of Appeals) considered a presentment challenge under *Anderson* after the adoption of Rule 5(a) in *Barnett v. United States*, 384 F.2d 848 (5th Cir. 1967)[5]. There, this Court

---

[5] Fifth Circuit decisions released prior to close of business of September 30, 1981, are binding precedent in the Eleventh Circuit pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

68

observed that in looking at the relationship of the joint state-federal investigation:

> The necessary inquiry is whether the cooperation between state and federal officials had as its purpose a mere interchange of information and resources between two legitimate investigations, one state and the other federal, or to permit in-custody investigation and interrogation by federal officials without compliance with Rule 5(a). The purpose must be determined objectively from all surrounding circumstances. A high degree of cooperation by state officials in making the subjects available for interrogation by federal officers is not conclusive. *White v. United States, supra.* Nor is it controlling that the individuals were taken into state custody because of information furnished to state officials by federal officers, although it is relevant that federal officers stimulated the state investigation. *United States v. Coppola, supra.* However, the existence of a legitimate state investigation for a suspected state offense is essential to a valid purpose, and it is important whether or not state officials will proceed with further action on the state charge independent of the outcome of the federal investigation. *United States v. Tupper*, 168 F.Supp. 907 (W.D. Mo. 1958).

*Barnett*, 384 at 849 (footnote omitted). There, the Court rejected the presentment argument on the grounds that the evidence demonstrated that state and federal investigations "began separately and proceeded concurrently and cooperatively only after the Secret Service learned through the Coast Guard that Tennessee officers also were searching for appellants." *Id.* Further, there was no evidence that the state authorities wouldn't have pursued and prosecuted the defendants but-for the federal investigators' efforts. *Id.* at 858-859. While *Barnett* found that the

69

conduct at hand didn't rise to the level of the conduct found in *Anderson* due to the truly independent and collaborative efforts of state and federal authorities, the same cannot be said for Davis' case.

Davis' prosecution was meant to become a federal one. Federal officers played a critical role in the investigation that resulted in Davis' arrest and prosecution. While state charges nominally followed Davis' arrest, both Faggert's testimony at the various hearings and from the evidence presented in those hearings and at trial result in one conclusion: Davis was going to be prosecuted federally and all these efforts to capture him had that goal in mind. At the suppression hearing on this issue, Faggart acknowledged the role played by federal authorities. Doc. 113 at 52-60. Federal authorities were brought onto the case precisely because the investigation was proving too difficult and expensive for the MPD to handle on its own. *Id.* at 52. Federal authorities and resources were needed to bring a carjacker/robber in the Montgomery area to justice, so the feds took over the efforts. Faggert repeatedly referenced the federal crimes being committed in his warrant applications.

The manner in which this case unfolded demonstrated a clear intent from authorities to prosecute Davis for federal offenses, not state charges.

There was no true "dual track prosecution" here. Davis was going to be prosecuted in federal court for the carjackings, robberies, and brandishing offenses. Faggert's testimony at the suppression hearing that this was only a state case at its inception cannot be reconciled with evidence before this Court. The state charges were dropped after the grand jury no-billed the state case against Davis. Doc. 113 at 85. Again, while state officers were involved in this investigation, the efforts here were undoubtedly federal in nature and heading towards this federal prosecution, not state charges. That a state arrest warrant was obtained at the 11th hour to "start" the process in state court as opposed to federal court should have little bearing on whether this was truly a federal investigation and prosecution.

Between the investigative evidence, Faggert's words to Davis during his interrogation, and Faggert's testimony at the suppression hearing, it is evident that this was truly a federal investigation and prosecution, and the state warrants were only used for expediency, not to truly initiate distinct state prosecutions. Again, these state charges were no-billed by a grand jury while the federal prosecution unfolded. The district court's

71

conclusion that this wasn't a federal investigation and prosecution strains credulity.

Moreover, in another context involving the combination of state and federal authorities in executing an arrest warrant, the Fifth Circuit Court of Appeals concluded that the joinder of state and federal efforts requires that court to analyze issues through the lens of federal law. In *United States v. Tedford*, 875 F.2d 446 (5th Cir. 1989), state and federal authorities conducted a nighttime raid of Tedford's residence although the state warrant didn't authorize such a nighttime raid. *Id.* at 447-448. Tedford argued the participation of the federal authorities meant they had to comply with Rule 41, which wouldn't allow the nighttime raid. That court explained:

> When federal officers participated in the joint search of Tedford's residence it became a "federal search" subject to the constraints of federal law. *See, e.g., United States v. Comstock,* 805 F.2d 1194, 1200–1205 (5th Cir.1986) (Rule 41 applicable to state search warrant executed by both state and federal officers), *cert. denied,* 481 U.S. 1022, 107 S.Ct. 1908, 95 L.Ed.2d 513 (1987); *United States v. Hanson,* 469 F.2d 1375, 1377 (5th Cir.1972) ("if a federal agent is invited to participate in a joint search with state officers, the legality of the search and the admissibility of the evidence seized in the search must be tested, in a federal prosecution, as if the search were exclusively federal") (citing *Byars v. United States,* 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927); *Lustig v. United States,* 338 U.S. 74, 79, 69 S.Ct. 1372, 1374, 93 L.Ed. 1819 (1949)). We therefore look to federal law to determine the legality of this search.

72

*Id.* at 448. Like how the nighttime raid and federal agent's participation led the court to consider the suppression issue under Rule 41, Davis' presentment claim should be considered through the lens of Rule 5 due to federal officers' integral participation in this investigation, arrest, interrogation, and, ultimately, the prosecution.

Finally, to the extent that this Court believes that this wasn't a federal case under the parameters of *Alvarez-Sanchez*, Davis has demonstrated the requisite improper collaboration to trigger the *Alvarez-Sanchez* exception. Again, this investigation couldn't have happened without the federal authorities and resources. The state abandoned the pursuit of these charges during the middle of the federal case. This case isn't like *Alvarez-Sanchez* or *Barnett* where true dual-tracks prosecutions were unfolding. Instead, these circumstances are functionally the same as those in *Anderson* where suspects rights were violated through state-federal cooperation. Accordingly, the district court erred in concluding these circumstances didn't fall within the improper cooperations exception discussed in *Alvarez-Sanchez*.

The investigation leading to Davis was federal in nature. This has ended up where it was always meant to be: in federal court. Because this

73

wasn't a true state-federal dual-track investigation and prosecution and because improper collaboration occurred, the district erred in rejecting Davis' claim that his federal presentment rights were violated. Accordingly, this Court should reverse the denial of Davis' motion to suppress his statement.

## II. Davis is due judgments of acquittal to his remaining charges because the United States failed to present sufficient evidence demonstrating Davis intended to seriously harm or kill any of his carjacking victims.

At trial, the United States was required to present sufficient evidence that Davis intended to either seriously harm or kill anyone. The United States, however, failed to do so. The jury had before it ample evidence that Davis did not intend to seriously harm or kill any victim of his crime. Without this required showing, the United States could not make a legally sufficient case of carjacking and the accompanying charges for brandishing a firearm during the carjackings. As such, this Court must reverse and render Davis' 6 convictions.

> In order to be convicted of carjacking under 18 U.S.C. § 2119, the government must prove that the defendant (1) with intent to cause death or serious bodily harm (2) took a motor vehicle (3) that had been transported, shipped or received in interstate or foreign commerce (4) from the person or presence of another (5) by force and violence or intimidation.

*United States v. Diaz*, 248 F.3d 1065, 1096 (11th Cir. 2001). In *Holloway v. United States*, the Supreme Court explained that § 2119's intent element requires the United States to prove "that at the moment the defendant demanded or took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car." *Holloway v. United States*, 526 U.S. 1, 12 (1999). "The defendant's intent 'is to be judged objectively from the visible conduct of the actor and what one in the position of the victim might reasonably conclude.'" *United States v. Fulford*, 267 F.3d 1241, 1244 (11th Cir. 2001) (quoting *United States v. Guilbert,* 692 F.2d 1340, 1344 (11th Cir. 1982)).

This issue turns on the question of whether the United States presented sufficient evidence for "a rational jury to conclude beyond a reasonable doubt that" Davis acted with intent to cause death or serious bodily harm if necessary to steal the cars. *Diaz*, 248 F.3d at 1098 (cleaned up). Following trial, Davis filed a post-trial motion for judgment of acquittal arguing that, under *Holloway*, the United States failed to present sufficient evidence that Davis acted with an intent to seriously harm or

75

kill the vehicle owner. Doc. 173. This failure occurred not just once, but for all three counts of alleged carjacking.

For all three counts of alleged carjacking, testimony demonstrated the presence of a firearm. Doc 224 at 30 (Count 1); *id.* at 65 (Count 5); *id.* at 91 (Count 11). For Counts 1 and 5, Davis allegedly pointed the firearms at the victims. *Id.* at 30, 65. However, on cross-examination, both Rollins and Rivas admitted that they didn't tell police about a gun being pointed at anyone when they were interviewed on the days of their respective carjackings. *Id.* at 35, 71. In Count 11 Davis allegedly nodded his head towards a visible gun at his waist, but never pointed it at Thomas. *Id.* at 90. While the United States asked Thomas, "What did you think would have happened to you if you hadn't turned over the car," she answered uncertainly, "I don't know. He could have shot me or – I don't know." *Id.* at 92. Rollins and Rivas were likewise uncertain what would happen. *Id.* at 36 and 68.

What did not occur, however, was any actual verbal threat or violence to accomplish the theft of the victim's vehicles. At most, Davis' actions amounted to "an empty threat or intimidating bluff" to convince the victims to give up their vehicles. *Holloway*, 526 U.S. at 11. While empty

threats and intimidating bluffs might suffice to show simple intimidation, the Supreme Court has made clear that toothless hints at consequences are "not enough to satisfy § 2119's specific intent element." *Id.* This Court has also explained that if the evidence shows "that the driver-victim may have surrendered his car based on an "empty threat" or "intimidating bluff," there must also be evidence of "intent to inflict physical harm on the victim" before a defendant can be convicted of carjacking. *In re Smith*, 829 F.3d 1276, 1281 n.5 (11th Cir. 2016).

Here, there was no evidence of any acts of aggression toward the victims other than the brandishing of a firearm, there was no evidence that any verbal threats of any kind were made to any victim, there was no testimony elicited from any victim that they thought they were going to die or suffer a *serious* bodily injury. The most any victim testified to was possibility or probability of being shot. Possibilities or probabilities are not sufficient evidence. *See generally United States v. Charles*, 313 F. 3d 1278 (11th Cir. 2002)*; see also Cosby v. Jones*, 682 F.2d 1373, 1383 n. 21 (11th Cir. 1982) (""The Court of course does not mean that whenever the record supports conflicting inferences, no matter how weak, the prosecution wins, for not only would this be no more stringent than the standard

77

of review in a civil case but also the prosecution would only fail in its proof where there was a total absence of probative evidence, which is the "no evidence" standard rejected in *Jackson* [*v. Virginia*, 443 U.S. 307 (1979)]. If *Jackson's* beyond a reasonable doubt standard is to have any meaning, we must assume that when the choice between guilt and innocence from "historical" or undisputed facts reaches a certain degree of conjecture and speculation, then the defendant must be acquitted.").

The evidence could not support the inference that these victims might have reasonably concluded that Davis was going to kill them or serious harm them. There was a real and open question as to whether Davis pointed a gun at anyone during the October 30th or November 11th carjackings involving Rollins and Rivas. Neither told police at the time of their respective carjackings that a gun had been pointed at anyone. And neither testified that a verbal threat was made. Davis purportedly assured Thomas that he wasn't going to do anything and that he just wanted the car. Doc. 224 at 90. He didn't point a gun at her. As the district court observed, Davis never touched anyone. Doc. 190 at 5. Additionally, the court observed that the United States never demonstrated that the gun functioned. *Id.* And the jury heard Davis' tell Faggert that the

gun he used wasn't loaded. *Id.* at 144 (playing United States' Exhibit 19). Objectively speaking, it simply wasn't reasonable for any victim to conclude that Davis was about to kill them or seriously injure them.

Additional evidence supports this conclusion. This Court should also consider what else the jury saw from the nights of January 23rd, October 30th, and November 11th. In all the carjackings or business robberies that the jury heard about or saw on security video, Davis did not harm – let alone seriously harm or kill – any person on the days in question. These crimes affected at least a dozen individuals. Not one person was injured. The jury had before it evidence that Davis repeatedly feigned violence and bluffed his victims to carry out his carjackings and robberies. There's no argument that Davis used force and intimidation to carry out these crimes. But the totality of the evidence presented plainly demonstrates that Davis did not have the intent to seriously harm or kill anyone he targeted during these offenses. While the district court relied up on the victim-centric focus of *Fulford* in assessing intent, the jury likewise had ample evidence in front of it negating the allegation Davis had the requisite intent to seriously harm or kill Rollins, Rivas, or Thomas.

79

The jury had before it a reason to doubt Rollins' and Rivas' allegations that a gun was pointed at anyone during their carjackings. Likewise, the jury heard Thomas admit that Davis never pointed a gun at her. The jury likewise heard or saw how Davis came across at least a dozen people during the commission of his carjackings and robberies and not a single person got hurt, let alone seriously harmed or killed. The jury simply did not have before it sufficient evidence that Davis intended to seriously harm or kill anyone during his carjackings.

Because that evidence was lacking, he was due a judgement of acquittal for his carjacking charges. And because his carjacking charges must fail, so must his § 924(c) brandishing charges. As a result, the district court should have granted Davis' motion for judgment of acquittal and dismissed both the carjacking counts and the accompanying counts for brandishing a firearm in the commission of a crime of violence. This Court should correct the district court's error by reversing and rendering Davis' convictions.

80

## CONCLUSION

Based on the foregoing, this Court should render Davis' convictions or reverse the matter for a new trial.

Respectfully submitted on August 31, 2023.

<u>/s J.D. Lloyd</u>
J.D. Lloyd
The Law Office of J.D. Lloyd, LLC
2320 Arlington Ave. S.
Birmingham, AL 35205

*Counsel for Appellant*

81

**CERTIFICATE OF COMPLIANCE**

I certify that this brief contains 16,372 words and thus complies with the type-volume limitations of 11th Cir. Rule 22-2 and Rule 32(a)(7)(B)(i), Fed. R. App. P.  This brief is written in 14-point Century Schoolbook.

<u>/s J.D. Lloyd</u>
J.D. Lloyd

*Counsel for Petitioner*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2023, the foregoing Certificate of Interested Persons was filed electronically using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s J.D. Lloyd</u>
J.D. Lloyd

*Counsel for Petitioner*