**No. 23-10184-D**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

**UNITED STATES OF AMERICA,**

**Plaintiff/Appellee,**

**v.**

**JOHNNIE LEEANOZG DAVIS,**

**Defendant/Appellant.**

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION
Case No. 2:21-cr-00101-MHT-JTA-1**

---

# BRIEF OF APPELLEE


**JONATHAN S. ROSS
Acting United States Attorney**

**BRETT J. TALLEY
Assistant United States Attorney**

**ATTORNEYS FOR APPELLEE
UNITED STATES OF AMERICA**

**United States Attorney's Office
131 Clayton Street
Montgomery, AL 36104
(334) 223-7280
brett.talley@usdoj.gov**

**No. 23-10184-D**

***United States of America v. Johnnie Leeanozg Davis***

**<u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>**

In compliance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the United States Attorney for the Middle District of Alabama, through undersigned counsel, files this Certificate of Interested Persons and Corporate Disclosure Statement and certifies that the following individuals have an interest in the outcome of this case:

1. Adams, The Honorable Jerusha T., United States Magistrate Judge for the Middle District of Alabama;
2. Counts, Eric M., Assistant United States Attorney, Middle District of Alabama, counsel for the United States in the district court;
3. Davis, Johnnie, Defendant/Appellant;
4. Davidson, Kevin P., Assistant United States Attorney, Middle District of Alabama; counsel for the United States in the district court;
5. Duffey, Jeffrey Clyde, counsel for Defendant/Appellant Davis;
6. Geer, III, John Joseph, Assistant United States Attorney, Middle District of Alabama, counsel for the United States in the district court;

7. Griffin, Jr., Gregory Oswold, Assistant United States Attorney, Middle District of Alabama, counsel for the United States in the district court;
8. Jones, Justin Louis, Assistant United States Attorney, Middle District of Alabama, counsel for the United States in the district court;
9. Keith, Richard K., Montgomery, Alabama, former CJA appointed counsel for Defendant/Appellant Davis in the district court;
10. Lloyd, John Douglas (J.D.), counsel for Defendant/Appellant Davis;
11. Rivas, Alan, victim;
12. Rollins, Charles, victim;
13. Ross, Jonathan S., Acting United States Attorney for the Middle District of Alabama;
14. Talley, Brett J., Assistant United States Attorney, Middle District of Alabama, counsel for the United States on appeal;
15. The United States of America, Plaintiff/Appellee;
16. Thomas, Miangle, victim, and;
17. Thompson, The Honorable Myron H., United States District Judge, Middle District of Alabama.

Counsel is unaware of any publicly traded company or corporation that has an interest in the outcome of this case or appeal.

/s/ *Brett J. Talley*
BRETT J. TALLEY
Assistant United States Attorney

## **STATEMENT REGARDING ORAL ARGUMENT**

The United States of America ("the government") suggests that oral argument is not necessary in this case because the facts and legal arguments are adequately presented in the briefs and record before this Court, and the decisional process would not be significantly aided by oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................................... C-1 of 3

STATEMENT REGARDING ORAL ARGUMENT ..............................................i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF CITATIONS ..........................................................................iv

STATEMENT OF JURISDICTION.......................................................................1

STATEMENT OF THE ISSUES.......................................................................1

1. Did Davis have a reasonable expectation of privacy in his movements as tracked by the location of other people's cell phones?

2. To the extent Davis had a privacy interest in other cell phones, was the geofence warrant obtained by law enforcement invalid?

3. If the geofence warrant was invalid, did the *Leon* good-faith exception allow law enforcement to rely on that warrant?

4. Did law enforcement fail to timely present Davis to a federal magistrate, thus warranting suppression of his confession?

5. Could a reasonable jury conclude that Davis's threatening use of a firearm during carjackings satisfied the intent element of 18 U.S.C. § 2119?

STATEMENT OF THE CASE.......................................................................2

I. COURSE OF THE PROCEEDINGS AND DISPOSITIONS BELOW ....2

II. STATEMENT OF THE FACTS ..............................................................3

III. STANDARD OF REVIEW.....................................................................12

SUMMARY OF THE ARGUMENT ........................................................................13

ARGUMENT ....................................................................................................14

I. The district court properly denied Davis's motion to suppress evidence obtained through a Google geofence warrant ..........................................14

A. Davis has no cognizable privacy interest that collection of geofence data offended ..........................................................15

a. Davis had no reasonable expectation of privacy in someone else's cell phone or email account..................15

b. Davis had no reasonable expectation of privacy in his public movements.........................................................15

c. *Carpenter* only serves to strengthen the district court's decision .......................................................................22

B. To the extent Davis did have a privacy interest, the warrant satisfied Fourth Amendment requirements...............................27

C. The good-faith exception applies here....................................31

II. The district court properly denied Davis's motion to suppress his statement on presentment grounds .....................................................32

III. Even if one or both of the motions to suppress should have been granted, the failure to do so was harmless error.................................34

IV. Sufficient evidence supported the jury's verdict on the carjacking charge ...........................................................................................36

CONCLUSION ..............................................................................................38

CERTIFICATE OF COMPLIANCE ...................................................................39

## TABLE OF CITATIONS

**Cases**

*Alderman v. United States*, 394 U.S. 165 (1969)....................................................15

*Barnett v. United States*, 384 F.2d 848 (5th Cir. 1967).........................................33

*Carpenter v. United* States, 138 S. Ct. 2206 (2018)................ 22, 23, 24, 25, 26, 27

*Groh v. Ramirez*, 540 U.S. 551 (2004)............................................................ 29, 30

*Katz v. United States*, 389 U.S. 347 (1967)..................................................... 15, 16

*Riley v. California*, 573 U.S. 373 (2014)..................................................................24

*Smith v. Maryland*, 442 U.S. 735 (1979)..................................................................15

*United States v. Alvarez-Sanchez*, 511 U.S. 350 (1994)............................ 32, 33, 34

*United States v. Cooper*, 133 F.3d 1394 (11th Cir. 1998).......................................13

*United States v. Diaz*, 248 F.3d 1065 (11th Cir. 2001............................................36

*United States v. Drosten*, 819 F.2d 1067 (11th Cir. 1987).....................................35

*United States v. Fulford*, 267 F.3d 1241 (11th Cir. 2001).............................. 36, 37

*United States v. Guilbert*, 692 F.2d 1340 (11th Cir. 1982)....................................36

*United States v. Hinton*, 730 F. App'x 719 (11th Cir. 2018)..................................37

*United States v. Jones*, 565 U.S. 400 (2012).................................................. 19, 24

*United States v. Karo*, 468 U.S. 705 (1984).........................................................21

*United States v. Khoury*, 901 F.2d 948 (11th Cir. 1990)........................................35

*United States v. Knotts*, 460 U.S. 276 (1983).................... 16, 17, 18, 19, 20, 21, 22

*United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010) .......... 35

*United States v. McCall*, 2023 WL 7102161 (11th Cir. Oct. 27, 2023) .......... 30, 31

*United States v. Newsome*, 475 F.3d 1221 (11th Cir. 2007) .......... 13, 29

*United States v. Trader*, 981 F.3d 961 (11th Cir. 2020) .......... 22, 26

*United States v. Trujillo*, 146 F.3d 838 (11th Cir. 1998) .......... 13

**<u>Constitutional Provisions and Statutes</u>**

U.S. Const., amend. IV .......... 15

18 U.S.C. § 924(c)(1) .......... 1, 2, 3

18 U.S.C. § 1951 .......... 2, 3

18 U.S.C. § 2119 .......... 2, 3

18 U.S.C. § 3501(c) .......... 2, 32

18 U.S.C. § 3742(a) .......... 1

28 U.S.C. § 1291 .......... 1

**<u>Federal Rules of Appellate Procedure</u>**

Fed. R. App. P. 32(a)(7)(B) .......... 21

Fed. R. P. 5(a) .......... 2, 32, 33

Rule 26.1 .......... C-1 of 3

**<u>Eleventh Circuit Rule</u>**

Rule 26.1-1 .......... C-1 of 3

## STATEMENT OF JURISDICTION

A jury convicted Johnnie Davis of multiple counts of carjacking and brandishing a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 2119 and 18 U.S.C. § 924(c)(1). The Court has jurisdiction to consider this appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

1. Did Davis have a reasonable expectation of privacy in his movements as tracked by the location of other people's cell phones?
2. To the extent Davis had a privacy interest in other cell phones, was the geofence warrant obtained by law enforcement invalid?
3. If the geofence warrant was invalid, did the *Leon* good-faith exception allow law enforcement to rely on that warrant?
4. Did law enforcement fail to timely present Davis to a federal magistrate, thus warranting suppression of his confession?
5. Could a reasonable jury conclude that Davis's threatening use of a firearm during carjackings satisfied the intent element of 18 U.S.C. § 2119?

## STATEMENT OF THE CASE

### I. COURSE OF THE PROCEEDINGS AND DISPOSITIONS BELOW

Davis was tried on a superseding indictment alleging three counts of carjacking, in violation of 18 U.S.C. § 2119; four counts of Hobbs Act Robbery, in violation of 18 U.S.C. § 1951; and seven counts of brandishing a firearm during those crimes of violence, in violation of 18 U.S.C. § 924(c)(1)(A). Doc. 62. Following Davis's arrest, he filed a motion to suppress post-arrest statements, arguing that his right to presentment under Federal Rule of Procedure 5(a) and 18 U.S.C. § 3501(c) was violated. Doc. 85. This motion was denied on the basis that Davis was only in custody on state charges at the time and there was insufficient evidence of improper collusion with federal law enforcement. Doc. 142. Davis also filed a motion to suppress evidence provided by Google pursuant to a so-called "geofence" warrant. Doc. 110. Following two hearings, the lower court found that the searched phone belonged to a third party and Davis had no privacy interest in someone else's cellular information. Doc. 138 at 17–19. The court further determined that even if Davis had a privacy interest at stake, the *Leon* good faith exception applied. *Id.* at 19–21.

The case proceeded to trial. At the conclusion, the defense moved for directed verdict. Document 226 at 16.[1] As to the Hobbs Act Robbery counts, the district court dismissed on the grounds that the government did not establish an interstate nexus. *Id.* at 38–39. The carjacking counts proceeded to the jury. *Id.* at 40. Davis was convicted of the remaining counts and sentenced to a total of 315 months of imprisonment. Doc. 205 at 3. This timely appeal followed. Davis argues the district court should have suppressed his statements and information gained from the geofence warrant. Davis further argues that the evidence at trial was not sufficient to support a carjacking conviction.

## II. STATEMENT OF THE FACTS

In February 2021, a Middle District of Alabama grand jury indicted Johnnie Davis for his involvement in a string of carjackings and business robberies in the Montgomery area. Doc. 4. In December of the same year, the grand jury issued a superseding indictment alleging three counts of carjacking, in violation of 18 U.S.C. § 2119; four counts of Hobbs Act Robbery, in violation of 18 U.S.C. § 1951; and seven counts of brandishing a firearm during those crimes of violence, in violation of 18 U.S.C. § 924(c)(1)(A). Doc. 62.

According to the Presentence Investigation Report prepared by United States

[1] Page numbers in transcripts reflect those generated by the court's electronic filing system.

Probation in this case, between January 23, 2020 and November 11, 2020, an unknown perpetrator committed business robberies in the Middle District of Alabama. PSR at 5–9. Law enforcement believed the same person was responsible for each of these and also believed that this person had committed other robberies in the years prior. *Id.* Law enforcement concluded that vehicles used in the robberies had been obtained through carjackings. *Id.*

Because most of the robberies occurred in Montgomery County, the Montgomery Police Department (MPD) took the lead role in investigating the crimes. Doc. 113 at 52, 65. MPD investigators believed that cell phone information could identify the suspect, but budgetary challenges prevented MPD from pursuing that information through search warrants for cell tower location information. *Id.* at 52, 67, 85. As a result, MPD reached out to the Federal Bureau of Investigation for assistance. *Id.* at 52. At the time, the lead investigator for MPD, Miles Faggert, was both a sergeant with MPD and a task force officer with the FBI. *Id.* at 13–14. In his dual capacity, he coordinated the nascent FBI investigation with the ongoing work of the MPD, as well as collaborating with another department, the Prattville Police. *Id.* at 51, 57. While FBI took the lead role in gathering digital information, MPD responded to the robberies, interviewed the witnesses, and developed and followed up on leads. *Id.* at 67–68.

On January 23, 2020, MPD responded to a carjacking and business robbery believed to be committed by the same individual sought by the joint operation. *Id.* at 68. Miangle Thomas had just picked up her grandchildren from her mother's house when she was approached by a man at her car while she was putting her grandchildren in their car seats. Doc. 224 at 90–91. He told her not to move and that he wanted her car. *Id.* at 91. He was wearing a mask, and he gestured towards a gun in his waistband as he demanded the vehicle. *Id.* at 91–92. Thomas was scared, and she believed that if she did not comply, the robber "could have shot me or—I don't know." *Id.* at 92. That same night, a masked man walked into the Sunoco gas station on Carmichael Road and robbed it. *Id.* at 94–95.

The carjacked vehicle was located on Alderpoint Drive in Montgomery, Alabama. *Id.* at 148. MPD was able to recover video of the area when the suspect dumped the vehicle. *Id.* at 148–49. The video indicated that the robber ditched the vehicle and then got into another car to make his escape. *Id.* Video captured the license plate of the getaway vehicle. *Id.* at 150. It was for a black Ford Fusion belonging to Stacey Gilbert. *Id.* Stacey Gilbert is the sister of Portia Gilbert, who is the girlfriend of Davis. *Id.* at 141, 151.

In response to these robberies, Faggert prepared and presented a search warrant to Google, Inc. seeking what is known as a "geofence." Doc. 135 at 5. The

warrant documentation itself would later raise questions. The version served upon Google contained Attachments A through E. *Id.* at 7, 11–13, 17. It also contained an edit; where the warrant page seeks the property to be searched and seized, Faggert had drawn a line through "B" for Attachment B and added an "E" for Attachment E, along with his initials. *Id.* at 6. It was Attachment E that listed the items to be searched and seized. Doc. 131-14 at 8. Attachment A identified the locations and times establishing the outer bounds of the geofence. Doc. 131-14 at 3–7. Attachment A listed six locations and asked for devices within a hundred meters of those locations during a timeframe of 15 to 40 minutes on January 23 and 24, 2020. *Id.* These locations corresponded to locations in which video surveillance had captured the robber in action. Doc. 131-8 at ¶¶ 15–18.

When questioned about the specific edit on the search warrant, although Faggert could not recall making it, he testified that it was his practice to only edit warrants or the application in front of the judge. Doc. 135 at 7. He further testified that he would have put the warrant and all the attachments before the judge for the judge to inspect and approve. *Id.* at 35, 27–29, 31–32. Unfortunately, when the warrant was field with the clerk's office, only an unedited copy—without Attachments A through E—was filed. *Id.* at 6–7.

Google received the complete warrant and responded with anonymized

responses for devices connected to a Google service present in the designated area at the designated times. After analyzing this information, Faggert identified three devices that appeared possibly connected to the investigation. *Id.* at 22–25. After Google unmasked those devices, only one appeared to be relevant, and on June 15, 2020, Faggert learned from Google that it was connected to what the government deemed the "Yonna Gmail account." *Id.* at 51. This account was open on a device in the getaway car that video surveillance captured the robber entering. *Id.*

Special Agent Jay Berni would testify about this connection at trial. The location history was tied to a Google account, yonna3679@gmail.com. Doc. 224 at 114. This account was open on a cellular device with a number ending in 2401. *Id.* at 116. By tracking the progress of the device, the FBI was able to determine that it was in the area of the January 20 carjacking, the area of the business store robbery, and the area where the carjacked vehicle was eventually recovered. *Id.* at 119.

The cell phone in question, ending in 2401, belonged to Davis's girlfriend, Portia Gilbert. *Id.* at 155. Davis had a different number ending in 1197. *Id.* The yonna3679@gmail.com account belonged to neither Davis nor Gilbert. Rather, it was the email address of Gilbert's daughter, for whom Yonna is a nickname. *Id.* at 156.

On October 30, 2020, there was another carjacking and robbery. Charles

Rollins testified that he and his fifteen-year-old son were coming home from a football game in their Dodge Charger. *Id.* at 30. His son was driving, and when they pulled over to switch drivers, a tall, slender built masked man with dreadlocks approached and put two pistols in his son's face. *Id.* at 30–31. The man told them to run, and as they did, Rollins positioned himself in between the man and his son so that Rollins would be shot if the man chose to fire his weapons. *Id.* at 31. Rollins testified that if they hadn't given up the car, the man "was probably going to shoot my son." *Id.* at 36. That same night, someone robbed the Dollar General store on Perry Hill Road in Montgomery. *Id.* at 59.

MPD pulled video from the area on the night of October 30, 2020. The video showed a vehicle, a white Ford Fusion, pulling into the area of the carjacking. *Id.* at 44–45. A man got out of the vehicle and walked in the direction of the carjacking. *Id.* at 45–46. MPD began looking for this vehicle. Police pulled video from a Z-Mart gas station that included a white Ford Fusion, driven by a man wearing dreadlocks, pulling up to the pumps. *Id.* at 47–48. Police determined this was a rental vehicle, and police were able to obtain the rental agreement from Long Lewis Ford in Montgomery. *Id.* at 37. The vehicle was rented to Davis, and he listed his phone number as ending in 1197. *Id.* at 38. Police were also able to pull the GPS data for the vehicle for October 30, 2020. *Id.* at 41. After creating a map,

MPD placed the Ford Fusion in the vicinity of the carjacking on October 30. *Id.* at 121.

While police were investigating this incident, another carjacking occurred on November 11. Alan Rivas had just finished his shift as a Door Dash driver when he stopped by a tobacco store. *Id.* at 65. When he got back into his vehicle, someone stuck a gun through the open driver's side window and put it to Rivas's head. *Id.* The man told Rivas, "Don't think about it." *Id.* As Rivas got out of his car, the man asked him what he had in his pockets. *Id.* Rivas pulled a few dollars from his pockets, threw them in the driver's seat, and took off running. *Id.* The man was wearing a mask, but Rivas could see his dreadlocks underneath a hoodie. *Id.* at 67. When asked if he believed he could have been shot, Rivas testified, "Oh, yeah. For sure." *Id.* at 68. That same night, the Fresh Market in Montgomery was robbed by a man in a mask. *Id.* at 79–81. He put the money he stole in a red Door Dash bag. *Id.* at 83–84. Later that night, the same man robbed the Montgomery Dollar General on Eastern Boulevard. *Id.* at 85.

After the October 30 robbery, police sought a search warrant for the cell phone Davis had used to rent the vehicle that appeared to have been used during that night's carjacking. *Id.* at 157. This allowed police to track the phone in real time. *Id.* at 157–58. On November 11, when police learned of the new robberies,

they checked the status of the phone. *Id.* at 158. The ping showed Davis's phone at the Fresh Market when the robbery occurred. *Id.* at 159. When the next ping came in, it showed the phone at the Dollar General. *Id.* Officers made the decision to arrest Davis. *Id.*

On November 12, officers sought state search warrants from Elmore County and Montgomery County for residences in each area that Davis was known to frequent. Doc. 113 at 73–74. That morning, MPD executed the warrant in Montgomery County while the Elmore County Sherriff's Department executed the warrant in Elmore County. *Id.* at 46; 76–77. MPD took Davis into custody and transported him to the MPD Criminal Investigation Division where he was placed in a holding cell. *Id.* at 46–47. Davis was provided with lunch, and then at 2:15 PM he waived his Miranda rights and gave a statement to Faggert and FBI Special Agent Matthew Nahas. *Id.* at 45, 80–81; Doc. 224 at 142. The interview was played for the jury. Doc. 224 at 143–44. During the interview, which was admitted as Government's Exhibit 19, Davis admitted the October 30 and November 11 incidents but denied involvement in the January 23 carjacking and robbery. PSR at 8. Davis maintained that the firearm he possessed was unloaded. Doc. 224 at 143–44.

On December 3, 2020, Faggert swore out a federal complaint against Davis,

initiating this case. Doc. 1. Davis would eventually seek to suppress the statements he gave while initially in custody, arguing that his right to presentment before a federal magistrate was violated. Doc. 85. The government responded that Davis had been arrested on state warrants, taken into state custody, and booked on state charges. Doc. 89 at 7. That the federal government later charged Davis did not mean that his initial arrest was "de facto" a federal matter. *Id.* The district court denied Davis's motion to suppress.

Davis also filed a motion to suppress the evidence derived from the Google geofence warrant.[2] Doc. 110. Davis argued that the warrant lacked particularity in the things to be searched and seized. *Id.* at 7–8. Relatedly, Davis further argued that the warrants were general and overbroad. *Id.* at 11–15. Davis further argued that the good faith exception would not apply because no objectively reasonable officer could rely on the search warrant. *Id.* at 15.

The magistrate judge denied the motion to suppress. Doc. 138. The court noted that the dispute over how broad a geofence warrant is permitted to be assumed Davis had a reasonable expectation of privacy that had been invaded by the search. *Id.* at 17. This assumption, the court concluded, went too far. Davis had

[2] There were, in fact, two Google geofence warrants. Davis challenges only the second Google warrant issued in March 2020.

shown no evidence that either the Gmail account or device captured by the geofence search was associated with him in any way. *Id.* at 18. The court explained that the device searched "was not chronicling Davis' movements, but the movements of some other person who possessed the device." *Id.* at 19. The court further found that the *Leon* good faith exception applied. *Id.* at 19–21.

Davis proceeded to trial. At the conclusion of the evidence, Davis moved for acquittal as to the premises robberies on the grounds that the government had not established an interstate nexus; the district court granted the motion. Doc. 226 at 38–39. Davis also moved for acquittal on the carjacking charges, arguing the government had failed to prove the element that the defendant intended to cause death or serious bodily harm when taking the vehicle. *Id.* at 18. The district court denied this motion, and the remaining counts went to the jury. *Id.* at 39. Davis was convicted and sentenced to a total of 315 months of imprisonment. Doc. 205. This timely appeal followed. Davis challenges the lower court's findings on the two motions to suppress and argues that a reasonable jury could not have convicted him on the carjacking counts.

## III. STANDARD OF REVIEW

This Court reviews the denial of a motion to suppress on a mixed standard, reviewing the lower court's factual findings for clear error and its legal

conclusions *de novo*. *United States v. Newsome*, 475 F.3d 1221, 1223 (11th Cir. 2007). "The individual challenging the search bears the burdens of proof and persuasion." *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) (citation omitted).

This Court reviews sufficiency of the evidence challenges de novo, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Trujillo*, 146 F.3d 838, 845 (11th Cir. 1998). This is a deferential standard, and the "relevant question in reviewing a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

## SUMMARY OF THE ARGUMENT

Fourth Amendment law may be complicated, but this case is not. The Court need not delve into the limitations of geofence warrants; the device searched and the Gmail account identified did not belong to Davis. He has no privacy interest in someone else's cell phone or email and cannot challenge a search thereof. To the extent he does have a privacy interest, the geofence warrant specified with particularity a time and place to be searched where law enforcement had probable

cause to believe evidence of a crime would be located. The warrant was valid. And even if it were not, a reasonable police officer could rely on it in good faith.

The district court also properly denied Davis's motion to suppress his statement to police after his arrest. Davis was arrested on state warrants and charged with state crimes. His right to presentment was not triggered until he was in federal custody, and he has demonstrated no evidence of improper collusion between the federal and state authorities intended to avoid presenting him to a federal magistrate.

Finally, a reasonable jury could conclude that the evidence demonstrating that Davis brandished a firearm while engaged in a carjacking met the intent to cause death or serious bodily harm when taking the vehicle element of a carjacking offense.

## <u>ARGUMENT</u>

### I. The district court properly denied Davis's motion to suppress evidence obtained through a Google geofence warrant.

In seeking to suppress the fruits of the geofence search, Davis has a steep hill to climb. First, he must demonstrate that he has a reasonable expectation of privacy that the search offended. Assuming he does, he must then show that the search warrant was so obviously deficient on its face that no reasonable officer

would rely on it. He can demonstrate neither.

### A. Davis has no cognizable privacy interest that collection of geofence data offended.

#### a. Davis had no reasonable expectation of privacy in someone else's cell phone or email account.

The Fourth Amendment of the Constitution guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST., amend. IV. Since the 1960s, the Supreme Court has interpreted the Fourth Amendment to protect a person's "reasonable expectation of privacy." *See Katz v. United States*, 389 U.S. 347 (1967). The Court has bifurcated the question of what is reasonable into two parts: does the person have a subjective expectation of privacy, and is it one that society is willing to accept as objectively reasonable? *Smith v. Maryland*, 442 U.S. 735, 740 (1979). And it is axiomatic that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969).

That Davis can only succeed if he can show his own rights were violated presents him with an immediate problem. The device captured by the geofence warrant was not his. Nor was the Google service logged onto that device that allowed Google to track it his; that service was a Gmail account belonging to

Davis's girlfriend's daughter. Davis recognizes this problem, and he instead argues in his brief that the "protected interest here is not the device: it is the location and movement itself." Appellant's Brief at 38.[3] But Davis has another problem—the Supreme Court has repeatedly held that he has no privacy interest in his public movements.

**b. Davis has no reasonable expectation of privacy in his public movements.**

The Supreme Court has had, on multiple occasions, the opportunity to declare that warrantless electronic surveillance of a person's movements intrudes on that person's reasonable expectation of privacy. The Court has declined to do so. Instead, the Supreme Court's jurisprudence has confirmed again and again that, barring extraordinary circumstances, a person has no reasonable expectation of privacy in their public movements that electronic monitoring offends.

Davis's argument is squarely refuted by this precedent. As the Court explained in *Katz*, "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351. In *United States v. Knotts*, the Court was called upon to determine

[3] Davis briefly attempts to argue that he had a privacy interest because he was a Google account holder and if he'd had a Google device on him at the time, he would have had a privacy interest that was implicated. Appellant's Brief at 37. This is the equivalent of arguing he had a privacy interest in a dwelling because if he had lived there the police would have been invading his privacy when they searched it. Either Davis and his effects were searched or they were not. Fourth Amendment jurisprudence does not turn on hypotheticals and conditionals.

whether warrantless electronic surveillance of a vehicle's movements via radio transmitter violated the driver's reasonable expectation of privacy. 460 U.S. at 277. The beeper had been attached to a drum of chemicals purchased by the codefendant of Knotts, allowing the police to track the drum and the vehicle carrying it to a secluded cabin. *Id.* at 277. The Court noted that the "governmental surveillance conducted by means of the beeper in this case amounted principally to the following of an automobile on public streets and highways." *Id.* at 281. The Court easily concluded that the driver of "an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id.* at 282. A driver, the Court reasoned, "voluntarily conveyed to anyone who wanted to look the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property." *Id.* at 281–82. That the police electronically enhanced their ability to collect this information was of no moment; "Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case." *Id.* at 282. The Court also found it noteworthy that the beeper only allowed police to track the vehicle itself, explaining, "[T]here is no indication that the beeper was used in any

way to reveal information as to the movement of the drum within the cabin, or in any way that would not have been visible to the naked eye from outside the cabin." *Id.* at 285.

With equal ease, the Court dismissed the very objection Davis essentially raises in this case—that allowing technological surveillance of this type would result in "twenty-four hour surveillance of any citizen of this country…without judicial knowledge or supervision." *Id.* at 283. While reserving the possibility that such "dragnet type law enforcement practices" might implicate "different constitutional principles," the Court was unconvinced. *Id.* at 284. "Insofar as respondent's complaint appears to be simply that scientific devices such as the beeper enabled the police to be more effective in detecting crime, it simply has no constitutional foundation. We have never equated police efficiency with unconstitutionality, and we decline to do so now." *Id.*

Although technology and Fourth Amendment jurisprudence have advanced in the four decades since *Knotts* was decided, the case remains good law. Its holding—that police can track movements using electronic means—has never been overturned. In fact, cases examining other areas of warrantless electronic surveillance have sought to distinguish, rather than overturn or undermine, the *Knotts* decision.

In *United States v. Jones*, the Supreme Court considered whether a GPS device surreptitiously attached for 28 days to a suspect's vehicle—during which time it generated more than 2,000 pages of data—constituted a warrantless search in violation of the Fourth Amendment. 565 U.S. 400, 402–03 (2012). If the Supreme Court were seeking to overturn the holding in *Knotts* or even limit it on reasonable expectation of privacy grounds, this was the case to do so. But instead of overturning or limiting *Knotts*, the Court turned to a trespass-to-chattle theory that harkened back to the original understanding of the Fourth Amendment. Indeed, the Court assumed that the holding in *Knotts* was sound. *Id.* at 408–09; *see also Jones*, 565 U.S. at 420 (Alito, J., concurring) ("On the contrary, the Court accepts the holding in [*Knotts*] that the use of a surreptitiously planted electronic device to monitor a vehicle's movements on public roads did not amount to a search."). In fact, even the concurrence in *Jones*—which urged a more restrictive approach to this kind of surveillance when it stretched for weeks on end—did not quibble with the central holding in *Knotts*. *Id.* at 430 (Alito, J., concurring) ("Under this approach, relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. *See Knotts,* 460 U.S. at 281–282, 103 S. Ct. 1081."). Thus *Jones*, a case about the warrantless GPS tracking of a vehicle, invalidated that

tracking not because it violated the privacy rights of the driver, but because the police committed a trespass by attaching the device to the driver's vehicle without his knowledge or a warrant.

Given these binding precedents, when the police monitored the movement of Davis using a warrant that captured the information of another user via a geofence that monitored specific locations for less than twenty minutes at a time, doing so did not constitute a search that violated his reasonable expectation of privacy. Indeed, Davis's case is only distinguishable from *Knotts* by the technology used and the even lower privacy interest Davis can demonstrate. Unlike *Knotts*, in which the police were tracking the defendant himself, in this case the police used technology to track another person's movements on another person's device. The police did not invade the personal property or privacy interest of Davis himself. It would be no different had the police sought a warrant for a third party's surveillance camera that happened to catch Davis walking down the street after one of the robberies. In fact, in this case, the police did recover surveillance footage, GPS information from a rental car company, and cell phone ping information, all of which they used to track Davis's movements. And yet Davis does not challenge these searches as invading his "right to privacy in his location and movements,"

even though they are as invasive—if not more so—than the search of someone else's device and Google tracking.

Geofence tracking may be new, but the principles that allow it are not. Instead of a beeper that transmitted to a radio receiver, police used the location data transmitted by a cell phone to Google when certain applications are used on a phone. In both instances, police were able to follow the movements of their target through the use of technology. In both instances, these movements were in public, open to the world to see. In both instances, the subject "voluntarily conveyed to anyone who wanted to look the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property." *Knotts*, 460 U.S. at 281–82.

In fact, the tracking in *Knotts* was arguably even *more* intrusive than that in Davis's case. Because the tracker was on a container of chemicals that was removed from the vehicle and taken into the cabin, Knotts was able to at least make the argument that his case involved an intrusion into "the sanctity of Respondent's residence, which is accorded the greatest protection available under the Fourth Amendment." *Id.* at 284 (citations and quotation marks omitted); *see also United States v. Karo*, 468 U.S. 705, 714–16 (1984) (distinguishing between a

beeper used to track a vehicle's movements and one used to track movements inside a home). In Davis's case, on the other hand, it is undisputed that the locations searched by the geofence warrant were public locations related to the robberies; there's no argument that the tracking went inside Davis's home or any other location where he would traditionally receive heightened privacy protections.

#### c. *Carpenter* only serves to strengthen the district court's decision.

With no case squarely in support of him, Davis attempts to argue that his case should be governed by the Supreme Court's decision in *Carpenter v. United States.* Appellant Brief at 38. But Fourth Amendment law does not travel down parallel tracks, with lines of precedent that never meet. Rather, *Knotts* and *Carpenter* are consistent with each other, and the reasoning in *Carpenter* both reinforces *Knotts* and the decision of the lower court to deny Davis's suppression motion.

*Carpenter* did not involve a geofence of specific locations for a limited amount of time. Nor did it involve the search of a third party's location data, that only through further police work could be tied to the defendant. *See United States v. Trader*, 981 F.3d 961, 968 (11th Cir. 2020) (rejecting *Carpenter* attack on warrantless collection of IP addresses in part because they "can be translated into

location information only indirectly, by examining the internet company's business records to determine the physical address where the network is registered"). Rather, *Carpenter* involved the location tracking functions of a defendant's cell phone, functions "that provide a comprehensive chronicle of the user's past movements." 138 S. Ct. 2206, 2211 (2018). By accessing cell-site location information (CSLI) tied to Carpenter's phone over a period of several months, police were able to obtain nearly 13,000 location points, cataloging his every movement during that period. *Id.* at 2212. The Court recounted the staggering amount of information available to police through cell phone data, and the near limitless reach of that information to every American. "Whoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years, and the police may—in the Government's view—call upon the results of that surveillance without regard to the constraints of the Fourth Amendment. Only the few without cell phones could escape this tireless and absolute surveillance." *Id.* at 2218. Thus, the decision in *Carpenter* was not about whether a person had a protected privacy interest in their location and movement; it was about whether to extend precedents allowing for the limited tracking of movement to the "novel circumstances" raised by *Carpenter*. *Id.* at 2216–17. This, the Court declined to do.

In so deciding, the Court specifically distinguished between the kind of information available from limited tracking of a person in public and that generated by tracking a cell phone every moment of every day. The Court explained that the constant tracking of cell phones "present even greater privacy concerns than the GPS monitoring of a vehicle we considered in *Jones*." *Id.* at 2218. This is an understatement, as for many Americans, the first thing they do in the morning is reach for their cell phone, most often in the place they put it as the last thing they did the night before. *See Riley v. California*, 573 U.S. 373, 385 (2014) (observing that cell phones are "now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy"). This fact of modern life led to the critical distinction the Court made between appropriate warrantless electronic surveillance of a person's public movements and inappropriate surveillance of a person's cell phone. "While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Carpenter*, 138 S. Ct. at 2218.

In other words, the Court in *Carpenter* didn't take a harder look at long-term, constant tracking of cell phones merely because it allowed the police to follow someone's movements. They weren't concerned that the police had simply created a better beeper that allowed them to follow from a greater distance or even from the police station, or one that allowed them to use an app on their phone to track rather than a specialized radio receiver. They were concerned about the nature and scope of tracking via CSLI, tracking that is omnipresent, all-knowing, and all-seeing.

This is another flaw in Davis's reasoning. He presents the geofence of a specific area for a limited amount of time as the equivalent of Carpenter's "privacy interest in historical cell phone records used to track his every move," Appellant's Brief at 39, and a violation of his "reasonable expectation of privacy in the whole of his physical movements" protected by *Carpenter*. 138 S. Ct. at 2219. But such contentions are belied by both the record in this case and objective reality. For a period of twenty minutes or less in six specific locations, the police were able to track the presence of his girlfriend's cell phone through her daughter's open Gmail account. Doc. 131-14 at 3–7; Doc. 135 at 51; Doc. 224 at 114–19, 155–56. When the cell phone was not in one of these locations, Davis was invisible to them. Davis could have done anything in any other location in the world and police would have

had no idea. Had Davis's girlfriend closed the app on her phone, Davis would have been invisible to them everywhere, including those areas geofenced.

In fact, geofence monitoring of Davis was *less* invasive than mere physical surveillance. Unless Davis was in those areas geofenced and had a Google app activated, the police did not know where he was or what he was doing. They would have known more about the "whole of his movements" if they'd followed him in an unmarked police car.

The Court in *Carpenter* warned that its decision was not meant to undermine the rest of Fourth Amendment jurisprudence, noting that the Court's decision was "a narrow one." 138 S. Ct. at 2220. Rather, the Court explained that its decision was based on "the deeply revealing nature of CSLI, its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection…." *Id.* at 2223. That kind of information simply is not present here. This is not *Carpenter* 2.0. And this Court has recognized the limited scope of *Carpenter* itself.

In *United States v. Trader*, the Court was faced with the question of whether a defendant who voluntarily provided his internet protocol address to a third party when he downloaded and used an app could rely on *Carpenter* to suppress that evidence when the government received it without a warrant. 981 F.3d 961, 967

(11th Cir. 2020). The Court held that *Carpenter* "applies only to some cell-site location information, not to ordinary business records like email addresses and internet protocol addresses." *Id.* at 968. The Court explained that *Carpenter* left open whether the government could still receive limited cell site location data even without a warrant, noting that the Supreme Court had not foreclosed the government obtaining less than seven days' worth of cell-site location. *Id.* "It likewise left open the possibility that the government could collect cell-site location information in real time or through 'tower dumps' not focused on a single suspect." *Id.* (citing *Carpenter*).

Davis had no cognizable privacy interest in someone else's phone and location. He also has no cognizable privacy interest in his movements in public in specific, public areas for limited amounts of time. Even without a warrant, his motion to suppress would be doomed to fail.

**B. To the extent Davis did have a privacy interest, the warrant satisfied Fourth Amendment requirements.**

Assuming Davis did have a privacy interest at stake, law enforcement satisfied that interest by seeking and receiving a warrant. Even the strongest privacy concern is overcome by a properly executed warrant supported by probable cause. *See Carpenter*, 138 S. Ct. at 2221. Davis thus attacks the warrant itself.

A proper warrant contains probable cause in a sworn affidavit that particularly describes the place to be searched and the things to be seized. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). The initial warrant in this case contained an error; it referenced Attachment B as listing the areas to be seized and searched when it should have referenced Attachment E. This error was corrected and initialed by Faggert. Davis contends that if Faggert corrected the error on the warrant out of the presence of the magistrate judge, then it was approved without particularity, rendering the warrant invalid. Davis argues that because Attachment E lists the particular area to be searched, if the magistrate was presented with and approved a warrant referencing Attachment B, the warrant lacked particularity at the time it was signed. Appellant's Brief at 46–48.

But in order for the correction of the warrant to be a problem, Davis would need to show that Faggert made the edit outside the presence of the magistrate judge. During his testimony, Faggert testified that although he doesn't recall the specific circumstances of this warrant, his practice was to only make changes in front of the judge and then to initial those changes. Doc. 135 at 6. He further testified that he presented the full warrant, with all attachments, to the magistrate judge during the warrant review process. *Id.* at 25–29, 31–32. After hearing this testimony, the lower court judge concluded that there was "no law enforcement

wrongdoing to deter." Doc. 138 at 20. This factual conclusion is binding on the circuit court absent clear error. *Newsome*, 475 F.3d at 1223. Davis offers nothing more than speculation to support his contention that Faggert changed the warrant application outside the presence of the magistrate judge. That speculation is not enough to overcome the lower court's factual finding, particularly when it is the moving party that bears the burden of proof and persuasion.

Furthermore, even if Faggert corrected the scrivener's error outside the presence of the magistrate, that does not mean the warrant was invalid. Davis relies heavily on *Groh*, but in that case, the warrant in question did not include the items to be searched and seized at all, referencing instead the location to be searched. 540 U.S. at 554. This created two problems. First, the person receiving the warrant would not know what was being searched for; that information would be "neither known to the person whose home is being searched nor available for her inspection." *Id.* at 557. And because the warrant did not list the items to be searched and seized, the Court could not know if "the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit." *Id.* at 560. Neither problem is present here. Faggert testified that he presented the full warrant, with all attachments, to the magistrate judge for her review and approval. *Id.* at 25–29, 31–32. When the magistrate signed the warrant, she wasn't

relying on the affidavit alone, as in *Groh*. Here, the magistrate was presented with and reviewed the actual items to be searched and seized. Google was equally aware of what items the magistrate judge had authorized to be searched and seized. There is no dispute that the actual warrant with the correct Attachment was served on Google, allowing for the knowledge and ability to inspect the warrant that the *Groh* Court thought critical.[4]

Finally, to the extent Davis argues that geofence warrants are simply void in all circumstances because they lack particularity, this argument is a nonstarter. The warrant in this case described specific areas to be searched for a specific time period and specific information to be seized. *See United States v. McCall*, No. 21-13092, 2023 WL 7102161, at *7–8 (11th Cir. Oct. 27, 2023) (explaining that the best way to establish particularity and limit the scope of a data search warrant is by a "a temporal limitation. Officers can narrow their search by requesting data only for the time when an individual is suspected of planning or participating in criminal activity."). Those areas during those times and that information were directly connected to criminal activity and would identify the people in the area of the crimes at the time they were committed. The search area was limited in scope

[4] Davis notes that the copy of the warrant filed on PACER did not contain the Attachments. This is immaterial, as the actual warrant served on Google did.

and time. This was not a general warrant, but one as specific as any traditionally issued. By analogy, it is as if a traditional warrant not only described a home to be searched, but a specific drawer in a specific room for specific items contained therein.

**C. The good-faith exception applies here.**

Even if this Court were to find Davis had a privacy interest in someone else's phone and determine that the geofence warrants are fundamentally flawed, the good-faith exception would still apply. The government will not burden the Court with a recitation of the well-worn principles of *Leon*, but as the district court explained, "the officer's consultation with counsel, his past experience in seeking geofence warrants, and approval by a detached magistrate" all weighed in favor of applying the good faith exception. Doc. 138 at 20; *see McCall*, No. 21-13092, 2023 WL 7102161, at *8. Whatever the future may hold for geofence warrants, Faggert had no reason to believe that his warrant, signed by a detached magistrate judge, seeking information publicly broadcast to a third party that was directly related to several criminal actions, was somehow so obviously invalid that no reasonable officer would rely on it. *McCall,* No. 21-13092, 2023 WL 7102161, at *9 ("The detective reasonably could have believed that the seven categories of iCloud information fell within the practical margin of flexibility for his broad

investigative task, especially given the close connection between the cell phone used to commit the crime and the cloud account.”).

## II. The district court properly denied Davis’s motion to suppress his statement on presentment grounds.

Davis argues that the magistrate judge should have granted his motion to suppress his statement to investigators because he was not properly presented before a magistrate judge as required by Federal Rule of Criminal Procedure 5(a) and 18 U.S.C. § 3501. Davis argues that even though he was arrested by state authorities on state warrants and charged with state crimes, the investigation and arrest were in fact federal in nature. Appellant’s Brief at 61.

Davis needs some sort of untoward collusion to have occurred, as the law is clear: “Until a person is arrested or detained for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer ‘empowered to commit persons charged with offenses against the laws of the United States,’ and therefore, no ‘delay’ under § 3501(c) can occur.” *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994) (internal citations omitted). This is true even if the arresting officers “believe or have cause to believe that the person also may have violated federal law.” *Id.* The Supreme Court noted that application of the presentment rule should be “straightforward,” with “one presumably rare scenario that might present

some potential for confusion." *Id.* at 359. That one scenario would come into play when "state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment." *Id.* The longstanding rule is that the "necessary inquiry is whether the cooperation between state and federal officials had as its purpose a mere interchange of information and resources between two legitimate investigations, one state and the other federal, or to permit in-custody investigation and interrogation by federal officials without compliance with Rule 5(a)." *Barnett v. United States*, 384 F.2d 848, 858 (5th Cir. 1967). "The purpose must be determined objectively from all surrounding circumstances. A high degree of cooperation by state officials in making the subjects available for interrogation by federal officers is not conclusive." *Id.*

This case is straightforward. As the lower court determined, "[T]here is no evidence of improper collaboration between the FBI and MPD." Doc. 117 at 14. The investigation into Davis was routine. MPD had launched an investigation into his ongoing crimes in 2014; FBI did not join that investigation until three years later. Doc. 113 at 53, 62. In a quintessential sharing of information and resources situation, MPD asked FBI to join the investigation so as to avail themselves of FBI's capacity to conduct investigations involving cell phones. *Id.* at 52, 67, 85.

That cooperation continued throughout the investigation—FBI gathered digital information while MPD officers worked the case on the ground. *Id.* at 67–68. And Davis's arrest by state law enforcement was triggered not by a desire to avoid presentment but by Davis's accelerating rate of carjackings and robberies. *Id.* at 95–96. And in fact, federal officials continued to investigate Davis even after his arrest on state charges. *Id.* at 69–70.

Davis's only counter to these facts is that FBI and state officials worked together, that Faggert was both an FBI task force officer and an MPD officer, and that the case ultimately proceeded on federal rather than state charges. But none of these factors indicate improper collusion between the parties to frustrate Davis's right to presentment. In fact, there's no evidence at all that presentment was on anyone's mind at the time of Davis's arrest. Rather, this is a circumstance where "routine cooperation between local and federal authorities is, by itself, wholly unobjectionable." *Alvarez-Sanchez*, 511 U.S. at 360. "Only by such an interchange of information can society be adequately protected against crime." *Id.* (citation omitted).

## III. Even if one or both of the motions to suppress should have been granted, the failure to do so was harmless error.

Once a court determines that a constitutional error has occurred, it must then

determine if that error was harmless. *United States v. Khoury*, 901 F.2d 948, 960 (11th Cir. 1990). "[I]f the jury might have relied on the unconstitutional evidence in reaching its verdict, then the error was harmful unless the other evidence of guilt was so overwhelming that the defendant suffered no prejudice from the admitted evidence" *Id.* On the other hand, "[a] defendant suffers no prejudice where the court erroneously fails to suppress evidence obtained from an unlawful search which merely corroborates other overwhelming evidence of the defendant's guilt." *United States v. Drosten*, 819 F.2d 1067, 1072 (11th Cir. 1987). Harmless error analysis applies to admission of "an involuntary confession obtained in violation of due process." *United States v. Lall*, 607 F.3d 1277, 1292 (11th Cir. 2010).

Davis seeks to suppress two pieces of evidence: the results of the geofence warrant linking the device of Davis's girlfriend's daughter to the getaway car used after one of the robberies and Davis's confession to the October 30 and November 11 robberies. The admission of the geofence information is clearly harmless. Linking a device related to Davis to a getaway car used in one of the robberies was an important piece of information, but it merely corroborated the overwhelming evidence more directly tying Davis to the crime. As discussed above, that evidence included video, eyewitness testimony, the similarity in the crimes and how they were conducted, cell phone pings on Davis's own phone corresponding to the

locations of the carjackings and the robberies, and GPS data from a car Davis rented from a local dealership to commit one of the carjackings and robberies.

The confession undoubtedly carries more weight with the jury. However, Davis did not confess to charges related to the January 23 robbery and carjacking. That the jury still convicted Davis on this charge indicates that the overwhelming evidence was sufficient to support a finding of guilt, whether Davis admitted to the crime or not. Whatever the court decides on the motions to suppress, Davis's conviction should stand.

## IV. Sufficient evidence supported the jury's verdict on the carjacking charge.

Carjacking requires evidence that the defendant acted "with intent to cause death or serious bodily harm." *United States v. Diaz*, 248 F.3d 1065, 1096 (11th Cir. 2001). The intent element is objective; "The intent of the defendant is not to be measured by the secret motive of the actor, or some undisclosed purpose merely to frighten, not to hurt, but rather is to be judged objectively from the visible conduct of the actor and what one in the position of the victim might reasonably conclude." *United States v. Guilbert*, 692 F.2d 1340, 1344 (11th Cir. 1982) (citations and internal quotation marks omitted).

In *United States v. Fulford*, the Eleventh Circuit found that putting a gun to a

victim's face, telling him to get out of the car, and the victim testifying that he feared for his life was enough to satisfy the intent element. 267 F.3d 1241, 1244 (11th Cir. 2001). In *United States v. Hinton*, a panel of this Court found that evidence the defendant "pointed a gun at Allen and ordered him to get out of the car, and Allen testified that he jumped from the car because he feared for his life" was sufficient to meet the element. 730 F. App'x 719, 723 (11th Cir. 2018) (per curiam).

The facts of this case fit squarely within the fact patterns above and align almost perfectly with those in *Fulford*. During the January 23, 2020 carjacking, Davis carjacked a woman and her grandchildren. Doc. 224 at 90–91. He told her not to move and that he wanted her car. *Id.* at 91. He was wearing a mask, and he gestured towards a gun in his waistband as he demanded the vehicle. *Id.* at 91–92. Thomas was scared, and she believed that if she did not comply, the robber "could have shot me or—I don't know." *Id.* at 92.

During the October 30, 2020 carjacking, Davis pointed two pistols at the 15-year-old driver's face and demanded the vehicle. *Id.* at 30–31. His father, Charles Rollins, was with him, and as the two ran from the scene, Rollins positioned himself between Davis and his son so that he would be the one shot if Davis opened fire. *Id.* at 31. Rollins testified that if they had not given up the car, Davis

“was probably going to shoot my son.” *Id.* at 36. On November 11, Davis carjacked Alan Rivas, pointing a gun at his head and telling him, “Don’t think about it.” *Id.* at 65. When asked if he believed he could have been shot, Rivas testified, “Oh, yeah. For sure.” *Id.* at 68.

Davis’s actions weren’t accidental or incidental to some other crime. Rather, the car robberies he committed are classic examples of a carjacking. The purpose was to steal a vehicle, and Davis used a firearm to convince the drivers that they would be shot and even killed if they did not comply. The jury had more than enough evidence to reasonably conclude Davis was guilty of the charged offenses.

## CONCLUSION

For the reasons outlined above, the Court should affirm the conviction and dismiss Davis’s appeal.

Respectfully submitted this 13th day of November, 2023.

JONATHAN S. ROSS
ACTING UNITED STATES ATTORNEY

/s/ *Brett J. Talley*
BRETT J. TALLEY
Assistant United States Attorney

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B). This brief contains 8,857 words.

/s/ *Brett J. Talley*
BRETT J. TALLEY
Assistant United States Attorney